[Cite as *State v. West*, 2017-Ohio-4055.]

COURT OF APPEALS
FAIRFIELD COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | |
|---|---|
| STATE OF OHIO | JUDGES: |
| | Hon. Patricia A. Delaney, P. J. |
| Plaintiff-Appellee | Hon. John W. Wise, J. |
| | Hon. Earle E. Wise, Jr., J. |
| -vs- | |
| | Case No. 16 CA 11 |
| MATTHEW WEST | |
| Defendant-Appellant | O P I N I O N |

CHARACTER OF PROCEEDING:    Criminal Appeal from the Court of Common
                            Pleas, Case No.  15 CR 240

JUDGMENT:                   Affirmed

DATE OF JUDGMENT ENTRY:     May 31, 2017

APPEARANCES:

For Plaintiff-Appellee                 For Defendant-Appellant

GREGG MARX                             DENNIS C. BELLI
PROSECUTING ATTORNEY                   536 South High Street
ANDREA K. GREEN                        Floor 2
ASSISTANT PROSECUTOR                   Columbus, Ohio  43215
239 West Main Street, Suite 101
Lancaster, Ohio  43130

*Wise, John, J.*

{¶1}   Appellant Matthew West appeals his conviction entered in the Fairfield County Court of Common Pleas on two counts of felonious assault, one count of abduction, and one count of domestic violence, following a jury trial.

{¶2}   Appellee is State of Ohio.

### STATEMENT OF THE FACTS AND CASE

{¶3}   On June 26, 2015, the Fairfield County Grand Jury indicted Appellant Matthew West for Count One: Felonious Assault, in violation of R.C. §2903.11(A)(I) and (D)(I)(a), a felony of the second degree; Count Two: Felonious Assault, in violation of R.C. §2903.11(A)(1) and (D)(1)(a), a felony of the second degree; Count Three: Abduction, in violation of R.C. §2905.02(A)(2) and (C), a felony of the third degree; and Count Four: Domestic Violence, in violation of R.C. §2919.25(A) and (D)(2), a misdemeanor of the first degree. (Indictment, Fairfield C.P. No. 2015-CR-240, June 26, 2015).

{¶4}   The charges stemmed from an argument which took place on June 11, 2015 between Appellant Matthew West and his girlfriend M.A.

{¶5}   A jury trial commenced on January 26, 2016.

{¶6}   At trial, the jury heard testimony from M.A.'s ex-husband Ricky, Lancaster Police Officer Franklin Graf, Lindsey Mullins, R.N., Christa Nagle, Nurse Practitioner, Paula Fortner, R.N. and Nurse Practitioner, Dr. Michael Alexander, Dr. Jason Reed, M.A., Suzanne Pelletier-Capitini, and Appellant Matthew West.

{¶7}   The State began by calling M.A.'s ex-husband Ricky, who testified that on the evening of June 1, 2015, M.A. called him for help from a Kroger parking lot and that he could tell that she was extremely upset. Her voice sounded shaky and scared, and he

could tell that she had been crying and was out of breath. (T. at 57). He stated when he answered the phone, M.A. immediately said "I need help. Matt just kicked my ass." (T. at 57). Ricky stated that he went to the Kroger parking lot as fast as he could, because it seemed urgent. (T. at 60). When he entered the Kroger parking lot, it looked to him like M.A. was passed out against the window of the truck she was sitting in. (T. at 61). When M.A. then got out of the truck, she looked like she had gotten beat up. Ricky testified that she looked like "hell." (T. at 62). Ricky stated that he could see that she had marks on her neck, her legs, her feet, and her face, and appeared to be in pain. (T. at 62). He recalled that she was holding her ribs and clutching her shoulder; she could hardly stand, was having difficulty breathing, and had tears rolling down her face. (T. at 62-63).

{¶8} Ricky testified that moments after he arrived, Appellant pulled in the parking lot, and began to yell at both Ricky and M.A. (T. at 64). Appellant began to walk past Ricky toward M.A., but Ricky told Appellant to stop and that the cops were on their way. (T. at 64-66). Appellant then returned to his vehicle, and Ricky positioned his body in between Appellant and M.A. at all times, in an attempt to ensure her safety. (T. at 67).

{¶9} Ricky testified that after Appellant left, he immediately helped M.A. into his car and took her to the emergency room. (T. at 68). She was still clutching her side, was extremely shaky, and continued to state that she was in pain. (T. at 69-70). While en route to the Fairfield Medical Center Emergency Room, M.A. continued to cry, asking "Why me? Why me? Why does this happen to me? What did I do?" (T. at 69-50).

{¶10} Ricky stated that when they arrived at Fairfield Medical Center, he helped M.A. into a wheelchair and she was rushed in to see a triage nurse. (T. at 70). He recalled that when questioned by the nurse, M.A. told her that she had been assaulted by her

boyfriend; that it hurt to take a deep breath in; that her ribs were killing her; and that she was in pain all over. (T. at 161). He stated that M.A. was admitted to the hospital, and an officer from the Lancaster Police Department came to speak with her due to the reported domestic violence. (T. at 112). After the officer left, M.A. continued to cry and was very upset about the incident. (T. at 77). M.A. explained to Ricky what had happened earlier in the evening that led to her injuries. (T. at 77-81). M.A. then asked Ricky to call her mom to tell her what had happened that night. (T. at 82). He also stated that while they were at the hospital, Appellant sent M.A. a text stating that they were over, and that all of her stuff was going to be thrown out. (T. at 82).

{¶11} The State next called Officer Graf, who testified that he responded to a 9-1-1 domestic dispute call at approximately 2:00 a.m. on June 12, 2015. (T. at 110-111). He recalled that he first went to the Kroger parking lot where he located the empty vehicle but was then informed by dispatch that the victim was at Fairfield Medical Center. (T. at 111). Upon arriving at the hospital, he spoke with both M.A. and her ex-husband Ricky. (T. at 112). This conversation was recorded on Officer Graf's body camera. (T. at 114). He testified that when he questioned M.A. about what had occurred that evening, he did so outside of the presence of her ex-husband. (T. at 114-115). He stated that when he questioned M.A., she was lying in a hospital bed. (T. at 115). He observed that she had multiple scratches, was bleeding, moved slowly and appeared to be in pain. (T. at 115). Officer Graf also took pictures of her injuries. (T. at 131). He recalled that she was wincing and crying, though not sobbing. (T. at 115). He stated that she appeared to have consumed alcohol that evening but was coherent and did not seem intoxicated. (T. at 116). He recalled that after speaking with M.A., he asked her if she wanted to fill out an

affidavit for domestic violence, but she declined at that time. (T. at 118-119). He stated that it was his intention to sign the domestic violence affidavit on her behalf even though she had refused to do so. (T. at 119).

{¶12} While at the hospital, Officer Graf also spoke with M.A.'s ex-husband Ricky. (T. at 120).

{¶13} Approximately two hours later, Officer Graf received a call from Dispatch informing him that M.A. now wanted to sign a statement of domestic violence, so he returned to the hospital. (T. at 120-121). At the hospital, Officer Graf spoke with M.A. a second time, and then presented her with an affidavit for domestic violence and a domestic violence field report, which she filled in with help from the officer, and signed. (T. at 121-125).

{¶14} The jury also heard testimony from Lindsey Mullins, R.N., and Christa Nagle, Nurse Practitioner, who were working in the Emergency Department at Fairfield Medical on June 12, 2015. Each of the nurses testified that upon being asked what brought her to the hospital, M.A. informed them that she had been assaulted by her boyfriend. (T. at 161, 163, 185). She stated that she had been punched and kicked multiple times. (T. at 185).

{¶15} The jury next heard from Paula Fortner, R.N. and Nurse Practitioner, and Dr. Michael Alexander, who testified that they treated M.A. on June 14, 2015, when she came to the Emergency Department at Hocking Valley complaining of shoulder and rib pain. M.A., who came to the E.D. alone, stated that she had previously been treated at Fairfield Medical Center after being beat up by her boyfriend but continued to have severe shoulder and rib pain. (T. at 235, 254). X-rays were performed, M.A. was diagnosed with

a left shoulder fracture, was fitted with a sling, and a referral was made to see an orthopedist. (T. at 262).

{¶16} The State also presented the testimony of Dr. Jason Reed, the orthopedic surgeon who saw M.A. on June 22, 2015. He testified that when M.A. came to see him she was accompanied by a man whose name he did not know. When asked how the injury occurred, M.A. informed him that she fell down the stairs. (T. at 280). Dr. Reed diagnosed M.A. with a comminuted displaced greater tuberosity fracture and later, on July 17, 2015, performed arthroscopic surgery to repair M.A.'s shoulder.

{¶17} Prior to trial, M.A. had recanted the allegations made to Officer Graf in a sworn statement. She was called as a Court's witness.

{¶18} After waiving her Fifth Amendment rights to self-incrimination, M.A. testified that on the night in question, she and Appellant were out celebrating their 6-month anniversary with dinner and drinks at Roosters restaurant. (T. at 320-321). She recalled that after leaving Roosters, they stopped at the Cherry Street Pub for a few more drinks. (T. at 322). The couple then went home, where they ran into a friend and decided to all go to another bar, Berne Station, where they played pool and had a few more drinks. (T. at 324-325). M.A. testified that while they were at Berne Station, she and Appellant got into an argument. (T. at 326). The threesome returned back to M.A. and Appellant's apartment, and the friend left. (T. at 328). The argument between M.A. and Appellant then heated up and became physical. (T. at 328-330). She stated that she was trying to leave when Appellant tried to stop her from leaving and the two of them tumbled down the stairs, landing on the sidewalk and injuring her shoulder. (T. at 330-331). She stated that she

sustained further injuries when she stumbled and fell into the bushes when she was trying to get back up. (T. at 331-332).

{¶19} M.A. recalled that she then left the apartment complex in her vehicle and drove to a nearby Kroger parking lot. (T. at 337). She tried calling her brother, a sister-in-law, and a friend for assistance, but none of them answered. (T. at 338). She was able to reach her ex-husband Ricky. She told him she and Appellant had gotten into an argument. When Ricky arrived at the parking lot, she lied and told him Appellant had beat her up and asked him to take her to the hospital. (T. at 338).

{¶20} Upon her arrival at the Fairfield Medical Center emergency room, M.A. told hospital personnel and a police officer that her boyfriend had assaulted her. (T. at 343).

{¶21} Two days later on June 14, 2015, M.A. went to the Emergency Department at Hocking Valley Community Hospital because she was still in a lot of pain. (T. at 235, 345). Upon arrival, she saw a triage nurse and reported that she was there seeking medical attention because her boyfriend had beaten her up on Thursday night. (T. at 235). Additional x-rays revealed that she had a fractured shoulder, and she was instructed to see an orthopedic specialist. (T. at 264-280).

{¶22} On June 22, 2015, M.A. went to an orthopedic specialist, and when asked about the cause of her injuries, she stated that she injured her shoulder when she fell. (T. at 346). She was accompanied to this appointment by Appellant. (T. at 346).

{¶23} M.A. denied being physically harmed by Appellant, (T. at 347). She stated that she lied to her ex-husband about how she was injured because she wanted him to take her to the hospital. (T. at 338). She stated that she continued with the same lie with medical personnel because her ex-husband was present with her most of the time at the

hospital. (T. at 339-340, 347). She stated that she also lied to the police officer. (T. at 347-348, 395). M.A. claimed that her ex-husband threatened to take her children away from her if she did not prosecute Appellant. (T. at 349). She further claimed that she finally quit lying when she saw the orthopedic doctor because she did not want Appellant to get in trouble for something he did not do. (T. at 346).

{¶24} The State also played the audio/video recording from Officer Graf's body camera in open court wherein M.A. can be heard telling the officer "… things got out of hand. [Appellant] had threw me down several different times, you know, on the pavement (inaudible) and everything. … In the apartment (inaudible) all over. There's something done to my shoulder and my ribs. I can barely take a breath without it hurting really bad." (T. at 383). She also explained that she "drove that far [to the Kroger parking lot] just to get away from him" (T. at 384). She later stated again "… he had, you know, shoved me down a few times, I had hit him. And then that's when he actually started to hit me" and "… he had pushed me down on the sidewalk outside." (T. at 387).

{¶25} M.A. admitted that after initially declining to sign a statement of domestic violence, she requested the officer return and she filled out a statement wherein she wrote "He did hit me, he kicked me several times and pushed me down on the pavement. " (T. at 400). She further admitted she never once told anyone on June 12, 2015, or June 14, 2015, that she fell down the stairs, but instead told everyone that her injuries were the result of Appellant assaulting her. (T. at 401-402).

{¶26} In addition to the above testimony from M.A.'s ex-husband, hospital personnel and the responding police officer, the State called Suzanne Pelletier-Capitini, an expert on domestic violence and recantation.

{¶27} The defense relied on the testimony of Appellant Matthew West, who denied assaulting M.A. and stated that her injuries were the result of her falling down the steps. He claimed that she was about half-way down the outside apartment steps when he was trying to stop her from leaving when he grabbed her shoulder and they both fell down the steps. (T. at 548). He stated that he did not see her stumble into the bushes, but did see her kneeling down by the bush, and that she had scratches on her face and her neck. (T. at 548-549).

{¶28} On January 28, 2016, at the conclusion of the three-day trial, the jury returned a verdict finding Appellant guilty as charged on all counts.

{¶29} On March 9, 2016, Appellant's sentencing hearing took place. The trial court found that Count Three and Count Four were allied offenses of similar import with Count One and Count Two and merged for the purposes of sentencing. The trial court found that Count One and Count Two were not allied offenses, and the State elected to have Appellant sentenced as to Counts One and Two.

{¶30} The trial court sentenced Appellant to serve a prison term of four (4) years as to each count, to be served concurrently to one another. (Judgment Entry of Sentence, Fairfield C.P. No. 2015-CR-240, Mar. 15, 2016).

{¶31} Appellant now appeals to this Court, assigning the following errors for review:

## ASSIGNMENTS OF ERROR

{¶32} "I. THE STATE'S USE OF THE ALLEGED VICTIM'S UNSWORN ORAL STATEMENTS TO HER EX-HUSBAND, TO A POLICE OFFICER, AND TO MEDICAL PERSONNEL, AND EXTRINSIC EVIDENCE CONSISTING OF HER AUDIO/VIDEO

RECORDED INTERVIEW, A POLICE REPORT, AND THE UN-REDACTED MEDICAL RECORDS, AS SUBSTANTIVE EVIDENCE OF DEFENDANT-APPELLANT'S GUILT, VIOLATED THE RULES OF EVIDENCE, AND WHEN CONSIDERED IN CONJUNCTION WITH THE TRIAL COURT'S FAILURE TO GIVE THE JURY A LIMITING INSTRUCTION, DEPRIVED HIM OF HIS FOURTEENTH AMENDMENT DUE PROCESS RIGHT TO A FUNDAMENTALLY FAIR TRIAL AND RELIABLE JURY VERDICT.

{¶33} "II. THE STATE'S USE OF ANECDOTAL OPINION TESTIMONY OF A SOCIAL WORKER ON THE SUBJECT OF RECANTATION FOR THE PURPOSE OF PERSUADING THE JURY TO REJECT THE ALLEGED VICTIM'S EXCULPATORY IN COURT TESTIMONY AND ACCEPT HER PRIOR INCONSISTENT STATEMENTS AS SUBSTANTIVE PROOF OF DEFENDANT-APPELLANT'S GUILT VIOLATED THE RELEVANCY AND RELIABILITY REQUIREMENTS OF THE RULES OF EVIDENCE, AND DEPRIVED DEFENDANT-APPELLANT OF HIS FOURTEENTH AMENDMENT DUE PROCESS RIGHT TO A FUNDAMENTALLY FAIR TRIAL AND RELIABLE JURY VERDICT.

{¶34} "III. THE STATE'S IMPROPER CROSS-EXAMINATION OF DEFENDANT-APPELLANT PLACED HIM IN THE UNTENABLE POSITION OF EITHER ACCUSING OTHER WITNESSES OF LYING OR UNDERMINING HIS OWN VERSION OF EVENTS, AND THEREBY DEPRIVED HIM OF HIS FOURTEENTH AMENDMENT DUE PROCESS RIGHT TO A FUNDAMENTALLY FAIR TRIAL AND RELIABLE JURY VERDICT.

{¶35} "IV. DEFENDANT-APPELLANT WAS DENIED HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL, AS GUARANTEED BY THE SIXTH AND

FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, DUE TO THE COMBINED EFFECT OF MULTIPLE INSTANCES OF DEFICIENT PERFORMANCE."

**I.**

{¶36} In his First Assignment of Error, Appellant argues that the trial court erred in admitting certain evidence at trial. We disagree.

{¶37} More specifically, Appellant challenges the admission of statements made by the victim to police, medical personnel, and her ex-husband, as well as the video of her interview with the police officer, the police report and her un-redacted medical records.

{¶38} A trial court possesses broad discretion with respect to the admission of evidence and an appellate court will not disturb evidentiary rulings absent an abuse of discretion. *State v. Roberts,* 156 Ohio App.3d 352, 2004–Ohio–962, 805 N.E.2d 594 (9th Dist.). An abuse of discretion is more than a mere error in judgment; it is a "perversity of will, passion, prejudice, partiality, or moral delinquency." *Pons v. Ohio State Med. Bd.* 66 Ohio St.3d 619, 621, 614 N.E.2d 748 (1993). When applying an abuse of discretion standard, an appellate court may not substitute its judgment for that of the trial court. *Id.*

{¶39} Defense counsel made no objection at trial to the testimony of the police officer or medical personnel as to the statements made by M.A., the admission of the video recording of her interview with the police, or the un-redacted medical records. Accordingly, all but plain error is waived. *See State v. Santiago,* 10th Dist. No. 02AP–1094, 2003-Ohio-2877, at ¶ 11 (failure to object to the introduction of hearsay evidence at trial waives all claims of error except plain error).

{¶40} Pursuant to Crim.R. 52(B), a plain error or defect affecting substantial rights may be noticed if not brought to the attention of the court. *Long,* 53 Ohio St.2d at 94, 7 O.O.3d 178, 372 N.E.2d 804. Plain error is to be invoked only in exceptional circumstances to avoid a miscarriage of justice. (Citation omitted.) *Id.*

{¶41} The test for plain error is enunciated under Crim.R. 52(B). In order for Crim.R. 52(B) to apply, a reviewing court must find that (1) there was an error, i.e., a deviation from a legal rule; (2) that the error was plain, i.e., that there was an "obvious" defect in the trial proceedings; and (3) that the error affected "substantial rights," i.e., affected the outcome of the trial. (Citations omitted.) *State v. Barnes,* 94 Ohio St.3d 21, 27, 2002-Ohio-68, 759 N.E.2d 1240.

{¶42} Evid.R. 801(C) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Hearsay is inadmissible at trial unless it falls under an exception to the rules of evidence.

{¶43} The state counters that even if the statements are hearsay, they are otherwise admissible under an exception to the hearsay rule.

Police Officer

{¶44} M.A.'s statements to Officer Graf were admitted under the "excited utterance" exception to the hearsay rule. Again, no objection was made to their admission.

{¶45} The excited utterance exception to the hearsay rule is contained in Evid.R. 803(2). If applicable, the exception is valid regardless of whether the declarant is available as a witness.

**{¶46}** An excited utterance is "[a] statement relating to a startling event or condition made while the declarant is under the stress of excitement caused by the event or condition." The rationale for the admission of these statements is that the shock of the event causes the declarant's reflective process to be halted. Thus, the statement is unlikely to have been fabricated and carries a high degree of trustworthiness.

**{¶47}** There is no *per se* amount of time after which a statement can no longer be considered to be an excited utterance. The central requirements are that the statement must be made while the declarant is still under the stress of the event and the statement may not be a result of reflective thought.

**{¶48}** Officer Graf's testified that while speaking with M.A., she winced, cried, and had watery eyes. (T. at 114-116). He further stated that her statements to him were responsive, not reflective. (T. at 116). M.A. testified that she did not "have time to think through everything" when she was at the hospital. (T. at 397).

**{¶49}** M.A. also admitted that she told the officer Appellant had assaulted her, but explained that she was lying at that time. (T. at 363-392).

**{¶50}** The jury was free to accept or reject any and all of the evidence offered by the parties and assess the witnesses' credibility. "While the jury may take note of the inconsistencies and resolve or discount them accordingly * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence." *State v. McGregor,* 5th Dist. Ashland No. 15–COA–023, 2016–Ohio–3082, ¶ 10, citing *State v. Craig,* 10th Dist. Franklin No. 99AP–739 (Mar. 23, 2000). Indeed, the jurors need not believe all of a witness' testimony, but may accept only portions of it as true. *Id.*

Audio/video recording

**{¶51}** The audio/video recording of the police interview was admitted as extrinsic impeachment evidence after M.A. denied that she had told Officer Graf that Appellant had pushed her down and assaulted her. (T. at 377-380).

**{¶52}** Evid.R. 613 specifically contemplates the admission of extrinsic evidence of a prior statement under the circumstances outlined in Evid.R. 613(B), which provides:

**(B) Extrinsic evidence of prior inconsistent statement of witness.**

Extrinsic evidence of a prior inconsistent statement by a witness is admissible if both of the following apply:

(1) If the statement is offered solely for the purpose of impeaching the witness, the witness is afforded a prior opportunity to explain or deny the statement and the opposite party is afforded an opportunity to interrogate the witness on the statement or the interests of justice otherwise require;

(2) The subject matter of the statement is one of the following:

(a) A fact that is of consequence to the determination of the action other than the credibility of a witness;

(b) A fact that may be shown by extrinsic evidence under Evid.R. 608(A), 609, 616(A), or 616(B);

(c) A fact that may be shown by extrinsic evidence under the common law of impeachment if not in conflict with the Rules of Evidence.

**{¶53}** Ohio courts have regularly applied the rule to admit a witness's prior inconsistent statement for impeachment purposes. *See, e.g., State v. Fisher,* 8th Dist.

Cuyahoga No. 83098, 2004-Ohio-3123, ¶ 14; *State v. Shaffer,* 114 Ohio App.3d 97, 102, 682 N.E.2d 1040 (3d Dist.1996).

**{¶54}** Here, after the State used the recorded interview to refresh M.A.'s recollection and then to impeach M.A., she admitted that she had in fact made those earlier statements but maintained that she was lying then. (T. at 395-396).

**{¶55}** We find that the state satisfied the requirements of Evid.R. 613. The state laid the proper foundation before playing the recording, and the contents of M.A.'s statement went to a fact of consequence to the action: such testimony presented a conflict with her prior statement about whether Appellant had assaulted her. Thus, the trial court did not abuse its discretion by permitting the state to play the recording for the jury.

**{¶56}** Appellant argues that the state improperly relied on M.A.'s prior statement as substantive evidence of Appellant's guilt. As a result, he asserts that there is a serious risk that he was convicted based on unsworn testimony, in violation of the Fifth, Sixth, and Fourteenth Amendments.

**{¶57}** As a general rule, "prior inconsistent statements constitute hearsay evidence and thus are admissible only for the purpose of impeachment." 1 Gianelli, *Evidence,* Section 607.4, at 482–483 (3d Ed.2010); *see also id.,* Section 613.3, at 591. Accordingly, unless another hearsay exception applies, a party may not interrogate his own witness about a prior inconsistent statement "'for the purpose of offering substantive evidence against the accused.' " *State v. Dick,* 27 Ohio St.2d 162, 165, 271 N.E.2d 797 (1971), quoting *State v. Duffy,* 134 Ohio St. 16, 15 N.E.2d 535 (1938), paragraph two of the syllabus. Further, the prosecutor must not refer to such statements for their truth during closing argument. *State v. Richcreek,* 196 Ohio App.3d 505, 2011-Ohio-4686, 964

N.E.2d 442, ¶ 54 (6th Dist.), citing *State v. Kirk,* 6th Dist. Huron No. H–09–006, 2010-Ohio-2006, ¶ 28.

**{¶58}** During closing argument, the prosecutor did cite M.A.'s prior inconsistent statement as substantive evidence of Appellant's guilt. But because Appellant did not request a limiting instruction or otherwise object, plain-error review applies. *State v. Diar,* 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 9.

**{¶59}** Given the state's reliance on M.A.'s prior statements as substantive evidence and the lack of a limiting instruction, the jury may have considered the unsworn testimony in support of its conviction of Appellant. But the error was not outcome-determinative because M.A.'s recorded statement to Officer Graf was not the only testimony before the jury that Appellant had assaulted M.A. The jury also heard from hospital personnel and M.A.'s ex-husband, who all testified that M.A. told them that she had been assaulted by Appellant. Additionally, counsel for Appellant also referenced aspects of the video recording in his closing argument. (T. at 600-604).

**{¶60}** For these reasons, we reject this argument.

Medical Personnel

**{¶61}** Evid.R. 803(4) creates an exception from the hearsay rule for "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment."

**{¶62}** Statements in furtherance of diagnosis or treatment are presumed reliable since the effectiveness of the treatment depends on the accuracy of the information related.

**{¶63}** Upon review, we find no plain error in the admission of these statements at trial. We find that M.A.'s statements to medical personnel as to why she was seeking medical care and how she was injured were pertinent to her treatment. It goes without saying that a patient who complains that she fell down the steps or was in an automobile accident would require different tests and care than one who presents complaining of a sore throat or a piece of glass in her eye. The genesis of the injury is an important factor in diagnosis and treatment.

<u>Un-redacted hospital records</u>

**{¶64}** A stipulation was made to the admission of M.A.'s un-redacted medical records. We therefore find no plain error in the admission of same.

<u>Domestic Violence Police report</u>

**{¶65}** Defense counsel did object to the admission into evidence of the police report wherein M.A. accused Appellant of assaulting her.

**{¶66}** The domestic violence report in this matter was a one-page document wherein M.A. reported that Appellant "did hit me, he kicked me several times and pushed me down on the pavement." (T. at 400).

**{¶67}** Appellant argues that such statement was not admissible because M.A. admitted making the statements in the police report.

**{¶68}** Extrinsic evidence of a prior inconsistent statement by a witness is admissible * * * [i]f the statement is offered solely for the purpose of impeaching the

witness, the witness is afforded a prior opportunity to explain or deny the statement and the opposite party is afforded an opportunity to interrogate the witness on the statement or the interests of justice otherwise require; and "[t]he subject matter of the statement is * * * [a] fact that is of consequence to the determination of the action other than the credibility of a witness." Evid.R. 613(B)(1) and (2)(a).

{¶69} [U]nder Evid.R. 613(B), a party may introduce extrinsic evidence of a prior inconsistent statement to impeach the witness's credibility. In order to introduce the prior inconsistent statement into evidence, proper foundation must be laid. *State v. Lewis,* 12th Dist. [Fayette] No. CA2010–08–017, 2011–Ohio–415, ¶ 30, citing *State v. Mack,* 73 Ohio St.3d 502, 514–515, 653 N.E.2d 329 (1995). A proper foundation is laid where the witness denies making the prior statement. *State v. Hartman,* 12th Dist. [Clermont] No. CA98–06–040, 1999 Ohio App. LEXIS 1476, 1999 WL 188145 (April 5, 1999), citing *State v. Colvin,* 12th Dist. [Butler] No. CA94–04–092, 1995 Ohio App. LEXIS 903, 1995 WL 103235 (March 13, 1995). However, if a witness admits to making the prior inconsistent statement then extrinsic evidence is not admissible*. Id.; State v. Kulasa,* 10th Dist. [Franklin No.] 11AP–826, 2012–Ohio–6021, ¶ 12; *State v. Mathes,* 12th Dist. Clermont No. CA2012–03–028, 2013–Ohio–1732, ¶ 10.

{¶70} Here, at trial, M.A. first denied that she made such statements, then when confronted with same, she confirmed that she made these statements to Officer Graf but maintained that she had been lying when she made the earlier statements.

{¶71} Based on the same, we find that while extrinsic evidence of M.A.'s alleged prior inconsistent statements was arguably improper because she admitted making the

prior statements at issue, such admission was harmless as the remaining evidence, standing alone, constituted overwhelming proof of the defendant's guilt.

Statements to ex-husband

**{¶72}** M.A.'s statements made to her ex-husband Ricky, while in the hospital, were also admitted under the excited utterance exception pursuant to Evid.R. 803(2) as set forth above. Like the statements made to the Officer Graf, M.A.'s statements to her ex-husband described the "startling event" of being assaulted, while she was still under the excited caused by the assault, (T. at 72-81). M.A. was visibly upset, crying and having trouble breathing, while making these statements. (T. at 71-72). Again, these statements were responsive and not the result of reflective thought. We therefore find that the trial court did not err in admitting such statements.

**{¶73}** We likewise find M.A.'s statement of "Matt just kicked my ass" to her ex-husband made when she called him for help, qualified as an excited utterance, (T. at 58).

**{¶74}** Appellant's First Assignment of Error is overruled.

**II.**

**{¶75}** In his Second Assignment of Error, Appellant argues that the trial court erred in allowing the testimony of the State's expert on domestic violence and recantation. We disagree.

**{¶76}** The trial court herein permitted the State to present the testimony of Suzanne Pelletier-Capitini as an expert in the field of domestic violence and recantation. (T. at 478-508). Appellant claims that Ms. Pelletier-Capitini's testimony was not reliable and was of little relevance to the case.

**{¶77}** When assessing the admissibility of expert testimony, the threshold question to determine is whether the testimony was relevant under Evid.R. 401. Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. These provisions produce a low threshold of admissibility, which "reflect[s] the policy favoring the admission of relevant evidence for the trier of fact to weigh." *State v. Kehoe,* 133 Ohio App.3d 591, 606 (12th Dist.1999).

**{¶78}** Relevant evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury. Evid.R. 403(A).

**{¶79}** If the testimony satisfies the threshold determination of relevancy, our inquiry transitions to the dictates of Evid.R. 702, which provides as follows:

A witness may testify as an expert if all of the following apply:

(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the

result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:

(1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;

(2) The design of the procedure, test, or experiment reliably implements the theory;

(3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result.

{¶80} One has specialized knowledge if she "has information which has been acquired by experience, training or education which would assist the trier of fact in understanding the evidence or a fact in issue." *State v. Nemeth* (1998), 82 Ohio St.3d 202, 211. The determination of whether a witness possesses specialized knowledge so as to be permitted to testify as an expert is within the sound discretion of the trial court. *State v. Clark* (1995), 101 Ohio App.3d 389, 411.

{¶81} When performing this analysis, we are mindful that "courts should favor the admissibility of expert testimony whenever it is relevant and the criteria of Evid.R. 702 are met." *State v. Nemeth, supra*. "Furthermore, even if the exclusion of the evidence were error, reversal is warranted only on a showing of prejudice to the accused." *State v. Layton,* 6th Dist. Lucas No. L–90–345 (Feb. 28, 1992).

{¶82} In determining the admissibility of an expert witness's testimony, a court must consider whether that witness will aid the trier of fact in search of the truth. *State v.*

*Koss* (1990), 49 Ohio St.3d 213, 216; *Alexander v. Mt. Carmel Med. Ctr.* (1978), 56 Ohio

St.2d 155, 159; *State v. Clark* (1995), 101 Ohio App.3d 389, 411.

{¶83} Evidentiary rulings are within the broad discretion of the trial court and will

not be disturbed on appeal absent an abuse of discretion. *State v. Maupin* (1975), 42

Ohio St.2d 473, 479.

{¶84} Prior to allowing her to testify, the trial court conducted extensive *voir dire*

of Ms. Pelletier-Capitini as to her expertise in her specialized field of domestic violence,

(T. at 415-477). The trial court limited the expert's testimony to her knowledge and

experience about recantation in situations involving only one incident of domestic violence

rather than a cycle of violence. (T. at 435-441, 477).

{¶85} Upon review, we find that the expert's testimony was relevant. The jury was

presented with testimony from several disinterested witnesses that, when M.A. arrived at

the hospital on June 11, 2015, she reported that her boyfriend, Appellant, had caused the

injuries for which she sought treatment. The jury was also confronted, however, with

M.A.'s denial that Appellant had inflicted her injuries. The expert's testimony provided a

possible explanation for these discrepancies. Thus, the testimony was probative of the

issue presented for the jury's determination. Moreover, the Supreme Court has held that

expert testimony about the behavioral characteristics of victims of a specific type of abuse

is permissible. *See State v. Stowers* (1998), 81 Ohio St.3d 260, 262.

{¶86} Like all evidence presented by the state in a criminal case, Ms. Pelletier-

Capitini's testimony was intended to prejudice Appellant by increasing the likelihood of

his conviction, but Appellant has presented no specific argument as to how he was

*unfairly* prejudiced by this testimony. In our view, Ms. Pelletier-Capitini's testimony was within permissible limits.

**{¶87}** The trial court did not abuse its discretion when it concluded that Ms. Pelletier-Capitini's had specialized knowledge on the subject of domestic violence.

**{¶88}** Appellant's Second Assignment of Error is overruled.

**III.**

**{¶89}** In his Third Assignment of Error, Appellant argues that the State's cross-examination of Appellant was improper. We disagree.

**{¶90}** Appellant argues that the State's line of questioning concerning the truthfulness of the testimony of M.A., Ricky A., hospital personnel and the police officer was improper because it put him in the position of having to accuse those witnesses of lying.

**{¶91}** As a general rule, cross-examination is permitted "on all relevant matters and matters affecting credibility." Evid.R. 611(B). The scope of cross-examination lies within the sound discretion of the trial court, viewed in relation to the particular facts of the case. *State v. Slagle,* 65 Ohio St.3d 597, 605, 605 N.E.2d 916, 925 (1992). This exercise of discretion will not be reversed in the absence of a clear showing of an abuse of discretion. *Id.* An abuse of discretion implies that the court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore,* 5 Ohio St.3d 217, 219, 450 N.E.2d 1140, 1142 (1983).

**{¶92}** In the present case, the State properly sought to impeach Appellant's credibility. The trial court did not abuse its discretion in sustaining the State's objections to this line of questioning on cross-examination.

**{¶93}** Appellant's Third Assignment of Error is overruled.

**IV.**

**{¶94}** In his Fourth Assignment of Error, Appellant argues that he was denied the effective assistance of counsel. We disagree.

**{¶95}** A claim of ineffective assistance of counsel requires a two-prong analysis. The first inquiry is whether counsel's performance fell below an objective standard of reasonable representation involving a substantial violation of any of defense counsel's essential duties to appellant. The second prong is whether the appellant was prejudiced by counsel's ineffectiveness. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674(1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989).

**{¶96}** In order to warrant a finding that trial counsel was ineffective, the petitioner must meet both the deficient performance and prejudice prongs of *Strickland* and *Bradley. Knowles v. Mirzayance*, 556 U.S. 111, 129 S.Ct. 1411, 1419, 173 L.Ed.2d 251 (2009).

**{¶97}** The United States Supreme Court discussed the prejudice prong of the *Strickland* test:

**{¶98}** "With respect to prejudice, a challenger must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*, at 694, 104 S.Ct. 2052. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.*, at 693, 104 S.Ct. 2052. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.*, at 687, 104 S.Ct. 2052.

**{¶99}**  The United States Supreme Court and the Ohio Supreme Court have held a reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Bradley,* 42 Ohio St.3d at 143, 538 N.E.2d 373, *quoting Strickland,* 466 U.S. at 697, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

**{¶100}** Debatable strategic and tactical decisions may not form the basis of a claim for ineffective assistance of counsel. *State v. Phillips*, 74 Ohio St.3d 72, 85, 1995–Ohio–171. Even if the wisdom of an approach is questionable, "debatable trial tactics" do not constitute ineffective assistance of counsel. *Id.* "Poor tactics of experienced counsel, however, even with disastrous results, may hardly be considered lack of due process ***." *State v. Clayton*, 62 Ohio St.2d 45, 48, 402 N.E.2d 1189 (1980) (*quoting United States v. Denno,* 313 F.2d 364 (2nd Cir.1963), *certiorari denied* 372 U.S. 978, 83 S.Ct. 1112, 10 L.Ed.2d 143.

**{¶101}** In the present case, Appellant argues that the cumulative effect of his trial counsel's failure to object to the admission of hearsay evidence; failure to object to the State's closing argument; failure to request limiting instructions; failure to correct the record at sentencing deprived him of a fair trial.

**{¶102}** Upon review we find there is no reasonable probability that the outcome of the trial would have been different had counsel objected to the introduction of evidence and the hearsay statements discussed above. "Trial counsel is not ineffective for choosing, for tactical reasons, not to pursue every possible trial objection." *State v. Raypole*, 12th Dist. Fayette No. CA2014–05–009, 2015–Ohio–827, ¶ 24. This is because "[o]bjections tend to disrupt the flow of a trial and are considered technical and

bothersome by a jury." *State v. Steele*, 12th Dist. Butler No. CA2003–11–276, 2005–Ohio–943, ¶ 100, citing *State v. Hill*, 75 Ohio St.3d 195, 211 (1996).

{¶103} We likewise find that the decision of trial counsel to not pursue a line of questioning concerning Ricky A.'s knowledge of a prior incident of domestic incident involving M.A. and Appellant was likely sound trial strategy.

{¶104} We further find that counsel's failure to object to statements made during the State's closing arguments did not amount to ineffectiveness. We do not find that any of such statements were mischaracterizations of the evidence. Even if these statements were considered improper, they did not affect Appellant's substantial rights. The trial court instructed the jury that closing arguments were not evidence to be considered in deliberations.

{¶105} Appellant's Fourth Assignment of Error is overruled.

{¶106} Accordingly the judgment of the Court of Common Pleas of Fairfield County, Ohio, is affirmed.

By: Wise, John, J.

Delaney, P. J., and

Wise, Earle, J., concur.

.

JWW/d 0428