[Cite as *State v. Davis*, 2021-Ohio-237.]

**IN THE COURT OF APPEALS**

**ELEVENTH APPELLATE DISTRICT**

**LAKE COUNTY, OHIO**

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NO. 2019-L-170** |
| MICHAEL B. DAVIS, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Lake County Court of Common Pleas, Case No. 2018 CR 000266.

Judgment: Affirmed.

*Charles E. Coulson*, Lake County Prosecutor, and *Karen Sheppert*, Assistant Prosecutor, Lake County Administration Building, 105 Main Street, P.O. Box 490, Painesville, Ohio 44077 (For Plaintiff-Appellee).

*Vanessa R. Clapp*, Lake County Public Defender, and *Melissa A. Blake*, Assistant Public Defender, 125 East Erie Street, Painesville, Ohio 44077 (For Defendant-Appellant).

MARY JANE TRAPP, P.J.

{¶1} Appellant, Michael B. Davis, appeals from the Lake County Court of Common Pleas judgment convicting him of multiple counts of murder, felonious assault, and attempted murder, and sentencing him on two merged counts of murder and attempted murder. Mr. Davis, who had a long-standing history of mental illness and psychiatric treatment, attempted to commit suicide by swerving left of center at an

excessive speed into an oncoming automobile, killing the driver and severely injuring the passenger.

{¶2} Mr. Davis assigns eight errors on appeal, arguing that: (1) the trial court erred by failing to instruct the jury on the lesser included offenses for the charges of murder and felonious assault and by including within the jury instruction for his affirmative defense of not guilty by reason of insanity ("NGRI") an instruction for the affirmative defense of involuntary intoxication; (2) the trial court interfered with deliberations and confused the jury by providing them with a decision tree and new instructions in the court's response to a jury question; (3) his rights to due process and a fair trial were violated when the trial court limited the number of experts the defense was permitted to call; (4) the trial court erroneously allowed his statement asserting his right to remain silent to be played for the jury and permitted the state to use the statement in its closing argument; and (5) the trial court erred by permitting the admission of gruesome death photos that were highly prejudicial. (6) & (7) Mr. Davis further challenges both the sufficiency and manifest weight of the evidence. (8) Finally, Mr. Davis claims the trial court erred in meting out consecutive, maximum sentences that are unsupported by the record and, thus, contrary to law.

### Summary of Our Findings

{¶3} We find Mr. Davis's assignments of error to be without merit.

{¶4} (1) The trial court did not abuse its discretion in its instructions to the jury because the evidence did not support jury instructions for the lesser included offenses for murder and felonious assault or a separate instruction on involuntary intoxication apart from the instruction on insanity.

2

{¶5}  (2) The court's "decision tree" instruction did not likely confuse the jury. Rather, it was an aid to assist the jury with the verdict form. The court's response to the jury's question merely clarified the instructions already given and did not give the jury new or different instructions.

{¶6}  (3) The court properly excluded the testimony of two experts because they were likely to be confusing to the jury. One expert was unable to form an opinion as to insanity using the correct legal standard, and another was unable to distinguish insanity from diminished capacity, which is not recognized in Ohio.

{¶7}  (4) We also find that Mr. Davis's statement was not improperly used as evidence of his guilt because Mr. Davis did not invoke his right to remain silent while giving the statement.

{¶8}  (5) While the photographs that depicted the scene of the collision and the victims were painful to view, we cannot say they were prejudicial in nature, repetitive, or cumulative.

{¶9}  (6) & (7) We find the state introduced sufficient evidence that Mr. Davis purposely drove his vehicle at an excessive speed and crossed the center lane in order to collide headfirst with an oncoming vehicle, and the manifest weight of the evidence supports the jury's verdict.

{¶10}  (8) Lastly, Mr. Davis's consecutive sentences are supported by the record and are not contrary to law.

{¶11}  The judgment of the Lake County Court of Common Pleas is affirmed.

**Substantive and Procedural Facts**

{¶12} In the early afternoon of July 4, 2017, Mr. Davis was driving westbound on Route 6 in Willoughby Hills, Ohio, when he veered left of center and drove at a high speed into an eastbound, oncoming car. Mr. Davis's vehicle violently collided with the other vehicle, propelling the other car backward landing in a neighboring yard. The driver of the other car, Gregory Morawski, was killed by the blunt force impact to his head, trunk, and extremities. When emergency responders arrived at the scene, they found he still had a pulse but was pinned to the vehicle. They could not remove him until the fire department cut off parts of his vehicle. His passenger and fiancé, Heather Culp, was severely injured and required several surgeries.

{¶13} As the crash reconstruction expert would later testify, the speedometer in Mr. Davis's vehicle was frozen at 70 mph, and he estimated Mr. Davis collided with Mr. Morawski's car at a speed of approximately 68 mph. Mr. Davis made no attempt to slow his vehicle or swerve out of the path of collision.

{¶14} Mr. Davis, who also sustained injuries and was hospitalized, told medical personnel the morning after the accident that he took a "bunch" of prescribed medication, drank some alcohol, and drove into another vehicle at a high rate of speed in an attempt to commit suicide.

{¶15} A few days after the crash and after learning that the driver of the other car had died and the passenger had suffered serious injuries, Mr. Davis reported to several physicians that he had been hearing voices at the time of the incident. During a recorded interview with the court's forensic psychologist, Dr. Jeffrey Rindsberg, and in an earlier

4

written statement provided to this expert, Mr. Davis related more details of the events leading up to the crash.

{¶16} Mr. Davis explained that for three days before the incident, he had experienced hallucinations. Starting on the morning of the incident, Mr. Davis heard sirens and loud voices coming from outside his apartment and the electronic devices in his apartment. He felt like he was on a "military base" and there was an "invasion" or "something bad" going on. He was scared and tried to call his parents' home, but "the line was dead." He left his phone at his apartment because the "voices and sounds were coming out of all the electronic devices" and drove to his parents' home. He realized they were out of town; he had known that, but "for some reason," he had "forgotten that day." While in the car, he heard the sirens and voices from the radio. He turned off the radio, but he could still hear the sounds and voices. At some point during the drive, the sounds stopped. The "voices were coming through the radio even though [he] turned it off, but they changed and it was more like – it was like interviews with people who were going through the invasion and talking about what was coming or something like that." Those "interviews" stopped when he arrived at his parents' house.

{¶17} He tried to call his parents from their phone, but it was dead. Worried that "the world was coming to an end," he went out to his car for his first failed suicide attempt by carbon monoxide poisoning, followed by a second failed attempt by ingestion of "a lot" of Seroquel and a bit of gin. He then looked unsuccessfully for a gun in his parents' room.

{¶18} Mr. Davis decided to return to his apartment because he thought he would be "safer" there. He first turned the wrong way out of his parents' drive, turned on a side street, and "pictured an ambulance pulling in the driveway," which "freaked [him] out even

5

more." He turned around and was driving westbound on Rt. 6 when a voice told him to "accelerate and veer left." He turned into and collided with Mr. Morawski's oncoming vehicle.

{¶19} He said, "I wasn't aiming at anyone or anything. I didn't know what I was doing. I wasn't in control of my body and mind. It didn't even seem real. It was like I just was in a dream state." When asked what he was trying to do, i.e., why he was trying to kill himself, he replied, "I was trying to get home because I thought I would be safe. I was suicidal, but in that moment I was -- my mind was to get -- drive home."

{¶20} While he had never heard voices before this incident, Mr. Davis has suffered psychologically since he was very young, mostly dealing with bouts of major depression and anxiety. He began treatment at the age of nine. Over the long course of treatment, Mr. Davis had used over thirty different prescribed psychotropic medications. He described himself as "agoraphobic," a "hermit," and "depressed." There was no dispute from the physicians and experts who either treated Mr. Davis and/or evaluated his voluminous medical and psychological treatment records that he suffered from a mental disease and/or mental defect.

{¶21} Mr. Davis further described the hallucinations he experienced the days leading up to the incident. While watching a crime drama on television, he saw an alien come into the show, turning the show into a "sci-fi horror" show, which it was not. He sent a garbled text to a friend about Tina Fey and Amy Poehler becoming the "most powerful people in the world." He was hearing voices saying he was worthless. In addition to the hallucinations leading up to the incident, Mr. Davis said his body was "tingling." He

"always dealt with high anxiety, but [his] anxiety changed to like a burning sensation, like [his] whole body was on fire, and [he] couldn't stay still."

{¶22} At the time of the crash, Mr. Davis was under the care of a psychologist and a psychiatrist. He had been trying several new medications and stopped several old ones because he was struggling with major depression and experiencing severe insomnia. He had been in communication with his prescribing physician for new sleep medication in the days leading up to the collision, and both his psychologist and his mother tried to help him calm and "soothe" his body. He also reported in communications with friends and family prior to the collision and to investigators and treatment providers following the collision that he had not slept for several days prior to the crash. He had recently ended his five-year relationship with his girlfriend and had been unemployed for sixteen years. His parents financially supported him.

{¶23} After a police investigation, Mr. Davis was indicted on eight counts: murder, an unclassified felony, in violation of R.C. 2903.02(A); two counts of murder, unclassified felonies, in violation of R.C. 2903.02(B); two counts of felonious assault, second-degree felonies, in violation of R.C. 2903.11(A)(1); two counts of felonious assault, second-degree felonies, in violation of R.C. 2903.11(A)(2); and attempted murder, a first-degree felony, in violation of R.C. 2923.02 and 2903.02(A).

{¶24} Over the course of pretrial proceedings, the court determined Mr. Davis was competent to stand trial and granted Mr. Davis's motion to enter a plea of NGRI. More specific issues that arose during the pretrial and trial are discussed below as they pertain to an assigned error.

7

{¶25} A twelve-day jury trial was held, which included a court-ordered jury view of the route Mr. Davis took from his parents' house to the scene of the collision.

{¶26} Over seventeen witnesses testified during the state's case in chief. The central issue of Mr. Davis's NGRI defense was whether he appreciated the wrongfulness of his actions since no one disputed that he suffered from mental illness. The defense called two expert witnesses - one in pharmacology, Dr. Daniel Buffington; and another in psychology, Dr. James P. Reardon. The state presented rebuttal testimony from Dr. Rindsberg, as well as Mr. Davis's psychiatrist, Dr. Richard Hill, and a pharmacologist, Dr. Michael Reed.

{¶27} After deliberating for approximately two and half days, the jury returned a guilty verdict on all eight counts of the indictment. The jury found that Mr. Davis did not prove the affirmative defense of insanity by a preponderance of the evidence.

{¶28} At the sentencing hearing, the court found that counts two (murder), three (murder), four (felonious assault), and five (felonious assault) merged into count one (murder) and that counts seven and eight (felonious assaults) merged into count six (attempted murder). The court sentenced Mr. Davis to serve a mandatory prison term of 15 years to life for murder, consecutive to a stated prison term of 11 years for attempted murder.

### Pertinent Issues at Trial

### Motions in Limine

{¶29} Several motions in limine are pertinent to this appeal.

{¶30} The state filed the first motion in limine to preclude evidence of diminished capacity. More specifically, the state argued that the defense's proposed expert

8

witnesses failed to restrict their opinions in their sanity reports to the appropriate question of whether Mr. Davis's ability to appreciate the wrongfulness of his actions was "a result of a severe mental disease or defect" and rather than a result of a diminished capacity due to voluntary intoxication or merely lack of sleep.

{¶31} The court held multiple hearings to consider Mr. Davis's motion to enter a plea of NGRI and the state's motion in limine to preclude evidence of diminished capacity, which included hearing testimony from Dr. Rindsberg and Dr. Reardon, as well as two additional defense experts, Dr. George S. Glass, a practicing psychiatrist, and Dr. Daniel Buffington, a clinical pharmacologist.

{¶32} The court granted the state's motion in limine in part, finding that Dr. Glass would not be permitted to testify for the defense because diminished capacity is not a recognized defense in Ohio pursuant to R.C. 2945.391. More specifically, the court determined that Dr. Glass's opinions concerning Mr. Davis's sanity at the time of the collision were "inextricably intermingled with a finding of diminished capacity" and that he could not conform his opinion to the correct legal standard for insanity.

{¶33} The court further determined that Dr. Buffington and Dr. Reardon were qualified to testify as experts for the defense, and Dr. Rindsberg for the state.

{¶34} The state filed the second relevant motion in limine to prohibit the testimony and any mention of the findings of Dr. Joseph Calabrese. The state argued that Dr. Calabrese, a consulting psychiatrist for the prosecution, gave conflicting opinions regarding the results of his review of Mr. Davis's records and also expressed difficulty with understanding and addressing the legal standard and the salient question of whether Mr. Davis knew the wrongfulness of his actions at the time of the crash.

9

{¶35} In discovery, the state provided Dr. Calabrese's preliminary draft report to the defense.[1] Ultimately, however, despite his initial opinions, the state represented to the court that Dr. Calabrese advised the state he was unable to render an opinion in his final report that focused on the statutory requirements for NGRI within a reasonable degree of psychiatric certainty. The state also argued it was improper for defense counsel to forward copies of Dr. Calabrese's initial and final reports to the court's expert, Dr. Rindsberg, and to an investigator on the case, Detective James Onion ("Det. Onion").

{¶36} The defense countered, in its brief in opposition, that exclusion of Dr. Calabrese's opinion would be a violation of Mr. Davis's right to a fair trial because the court's expert, Dr. Rindsberg, incorporated Dr. Calabrese's reports into his own findings. Thus, the defense would not be allowed to fully present its theory of the case if Dr. Calabrese's opinion was excluded. Defense counsel further argued that the state wanted to disregard Dr. Calabrese's opinion because it supported the defense's theory of the case.

{¶37} On the first day of trial, the court heard arguments from both sides on the issue prior to jury selection. The defense further argued that the state was trying to exclude Dr. Calabrese's opinion because it "ran inconsistent with [the state's] conclusion, that was discarded." The defense also argued that it should be permitted to offer this evidence to prove bias or a predetermined conclusion on the part of the investigators. The state disagreed, arguing that Dr. Calabrese's verbal opinion given to the prosecutors was the opposite of what he wrote in a draft and that he gave no opinion in his final report. The state represented to the court that Dr. Calabrese advised that the discrepancy was

---

[1] It must be noted that no report from Dr. Calabrese was made a part of the appellate record.

10

because he could not reach an opinion. The state asserted it was "very clear that in its discussions with Dr. Calabrese, he does not understand the legal standard."

{¶38} The court granted the motion, finding that Dr. Calabrese failed to use the correct legal standard in rendering his opinion and that he was the state's expert, who the state decided not to call to testify.

{¶39} The defense filed the third and fourth relevant motions in limine to exclude "inflammatory and prejudicial photographs of the decedent and vehicle" and "inflammatory and prejudicial photographs of autopsy." Defense counsel argued that these photographs should be excluded as redundant and prejudicial, pursuant to Evid.R. 401 and 403, because the photographs were not necessary to establish any facts in controversy, were graphic, and their prejudicial value far outweighed their probative value.

{¶40} Prior to the introduction of these photographs through Officer Leonbruno's testimony, admissibility of the photographs was argued at a sidebar conference.

{¶41} The state explained that they chose the photograph that was "the farthest away, it's a little blurry even, but it's for proximity and things like that, the purpose of it. [Officer Leonbruno] is going to testify this is after the roof was removed that they took the photograph, but he is going to testify this is where he was seated in the car and his legs were pinned in there, and it shows the proximity of the body, the way the Defendant struck the car.

{¶42} "It's directly relevant to what the State has to prove here, and it's the least shocking – it's not shocking, it's a fact. This is what it was like. This is a murder charge. It's a murder case, Judge. We have to show it."

11

{¶43} Similarly, a sidebar was called prior to the introduction of the autopsy photographs during the testimony of Dr. Daniel Galita, the forensic pathologist and medical examiner who performed the autopsy. The defense objected, arguing they were not challenging the manner of death; thus, the photographs were unnecessary. The state replied that the photographs were necessary to prove the elements of the crimes charged.

{¶44} The court found the photographs admissible, concluding that "[t]he ones that you're going to use, this is a homicide case, they're not inflammatory. I've seen much, much, much worse in a homicide case. This is an auto accident case, an auto collision is the cause of death, and they're fine."

### Expert Testimony

{¶45} Dr. Reardon testified for the defense regarding his forensic psychological evaluation of Mr. Davis. As part of his evaluation, Dr. Reardon went to Mr. Davis's apartment to conduct an interview. Mr. Davis grew increasingly anxious and progressed into a panic attack after approximately two and half hours, terminating the interview.

{¶46} Dr. Reardon agreed with Dr. Rindsberg's opinion that Mr. Davis "has a severe, long-standing mental disease that has – diseases that have compromised his ability to function." He found the "elements that could lead up to a psychotic episode or a psychotic break" were documented in the email exchanges between Mr. Davis and his psychiatrist, as well those with his friend.

{¶47} Based on his interview and a review of Mr. Davis's lengthy treatment records and medical history, Dr. Reardon concluded that Mr. Davis suffered from major depressive disorder (recurrent, with mood-congruent psychotic episodes, and panic attacks) and generalized anxiety disorder. Dr. Reardon found no evidence that suggested

12

Mr. Davis was not in a psychotic state at the time of the collision. Dr. Reardon opined that Mr. Davis could not know the wrongfulness of his actions, observing, "[I]f you're out of touch with reality, if you're in a psychotic state, you can't – if you can't even be in touch with reality, how could you know the wrongfulness of your actions?"

{¶48} The second expert to testify for the defense was clinical pharmacologist, Dr. Buffington. He agreed that Mr. Davis had recurrent major depressive disorder that was treatment resistant. Dr. Buffington analyzed the total number of medications Mr. Davis and his doctor were trying, including the time frames the medications were given, the dosages, and the effect of them on neurotransmitters in the brain. In Dr. Buffington's opinion, it was more probable than not that, at the time of the collision, Mr. Davis was suffering from psychosis as a result of adverse effects from the prescribed medicines.

{¶49} He based his opinion on multiple factors: Mr. Davis's long-standing history of multiple, chronic, and treatment-resistant psychiatric conditions; his severe insomnia at the time of the incident; multiple medication changes in a specific time frame and the negative impact this created "on neurotransmitter stability and function"; and the new symptoms experienced by Mr. Davis at the time of the event, i.e., the hallucinations, the increased anxiety, and the suicidality.

{¶50} Mr. Davis's psychiatrist, Dr. Hill, testified as a rebuttal witness for the state and described Mr. Davis's treatment and medications leading up to the collision. He had previously diagnosed and was treating Mr. Davis for a major depressive disorder. He testified that Mr. Davis did not previously suffer from any psychotic episodes while under his care, and he could not form an opinion whether Mr. Davis was in a psychotic state or suffering from side effects of his medications at the time of the incident.

13

{¶51} Dr. Rindsberg, the forensic psychologist for the court who had previously evaluated Mr. Davis for competency, also conducted an insanity evaluation. As a rebuttal witness for the state, he opined "with a reasonable psychological certainty that Mr. Davis was suffering from a severe mental disease * * * but that he did know what he was doing was wrong at the time of these charges." Dr. Rindsberg believed Mr. Davis knew the wrongfulness of his actions and did not "believe that there was psychosis." Even if Mr. Davis, however, was actively psychotic, he still would have known the wrongfulness of his actions.

{¶52} Pharmacologist, Dr. Reed, another rebuttal witness for the state, reviewed the defense pharmacologist's report and specifically examined Mr. Davis's medication use and the side effects of each medication. While Dr. Reed found Dr. Buffington's report "technically correct," he found it "appeared contrary to the detailed clinical records of Dr. Hill," since he did not find "drugs were being changed too rapidly." Thus, he concluded that "the medications prescribed, their doses and limited changes, based on close clinical monitoring and patient response and tolerability, were completely appropriate."

### Mr. Davis's Statement to Detectives

{¶53} Two days after the collision, while he was in the hospital, Mr. Davis was interviewed by Detectives Onion and Parmertor. The interview was recorded and played during Det. Parmertor's testimony with no objection from defense counsel. During the interview, Mr. Davis acknowledged his *Miranda* rights and answered questions regarding his background, including his history of mental illness and current medications.

{¶54} Det. Onion asked Mr. Davis to initial the *Miranda* rights on a form to acknowledge that he understood them. Mr. Davis replied, "Okay. Could you read them

14

to me once again * * * so I'm absolutely clear?" Det. Onion reread the *Miranda* rights, and Mr. Davis checked and initialed the form.

{¶55} Det. Onion asked Mr. Davis what triggered his action on the day of the incident. Mr. Davis responded, "Because it's fuzzy to me, and I don't want something I say one day to not match up with something I say another day because it is still so fuzzy and new, so I want to really be able to just put down in an ironclad statement that this is to the best of my knowledge what occurred that day and have everything match up perfectly."

{¶56} Det. Onion, stated, "Okay. All right," and the interview was concluded.

{¶57} The prosecutor replayed this statement during the state's closing argument while discussing Mr. Davis's sanity, remarking afterwards: "The interesting thing is, it's still fuzzy to me, I want to come up with an ironclad statement, I want everything to match up, things are matching up. July 4th to Dr. Asfaw, July 5th to Ms. Cimino, July 5th to Dr. Mars, July 5th to Dr Feldman, July 5th to Patrolman Vitale, five different people in five different roles – trauma, surgeon, social worker, neurologist, psychiatrist, police officer" were told "I [Mr. Davis] was trying to commit suicide. I failed with the 20 Seroquel, I drove into an oncoming car up to 60 miles per hour. I'm upset that I was unsuccessful."

### Jury Instructions on Lesser Included Offenses

{¶58} In determining the appropriate jury instructions, the court heard arguments on charging the jury on lesser included offenses. The state argued that instructions on the lesser included offenses for murder and felonious assault should not be included because the evidence did not support a lesser included offense or "a mens rea for anything but purposely and knowingly." The defense disagreed, arguing that the facts

15

could show Mr. Davis was reckless or negligent in operating a motor vehicle under the circumstances.

{¶59} In concluding there was no evidence to support instructions on the lesser included offenses of reckless homicide and involuntary manslaughter (for murder), assault and aggravated vehicular assault (for felonious assault), and negligent assault (for felonious assault), the court stated:

{¶60} "If there were no statements about intending to commit suicide, then the sleepiness would be sufficient in and of itself to get a reckless or a negligent instruction, but you have to consider that this was the third in a series of attempts of intentional conduct on his part.

{¶61} "I mean he didn't accidentally turn on the car in the garage and put the hose in the wrong pipe. That was a volitional act.

{¶62} "He didn't accidentally do that. He didn't accidentally take the drugs. He brought them with him. So he's acting volitionally.

{¶63} "Negligence is not a volitional act, it's truly an accident. It's a mistake. It's a lack of due care, a simple lack of due care. And coupled with the three suicidal ideations or attempts, three in a row within in a short period of time, there's only one rational explanation, that it was intentional.

{¶64} "Now, I'm not ignoring the insanity defense because that comes later. I'm talking about what has the State introduced evidence on, what's the state of the evidence and what can it support, and I'm agreeing with the State that the only thing in the record is that it's purposeful or knowing conduct. It's irrelevant whether he knew it was wrong for purposes of our discussion here, but it was knowing conduct."

16

{¶65} Defense counsel noted its objection and also filed a motion "for [the] court to submit all relevant jury instructions to trial jury," arguing that the evidence also supported an instruction on an involuntary intoxication affirmative defense since it is a legally separate and distinct defense from sanity. The court reviewed its research and heard arguments from counsel, concluding that "[t]here is no dearth of authority from other jurisdictions holding that the standard for involuntary intoxication is the same as that for insanity." The court further stated, "I have not found more than one case that would take it out of the realm as an arm of the insanity defense [when tried together]."

{¶66} The court determined it would charge the jury on the affirmative defense of insanity and include an involuntary intoxication instruction within the insanity instruction rather than as a separate instruction. The jury was instructed that "[t]o establish the defense of insanity, pursuant to R.C. 2901.01(A)(14), the defendant must prove by a preponderance or the greater weight of the evidence that at the time of the offense, the defendant did not know, as a result of a severe mental disease or defect, *and/or involuntary intoxication*, the wrongfulness of his act. * * * A person is insane and not responsible for criminal conduct if at the time of his act or acts: (A) He had a severe mental disease or defect, *and/or was involuntarily intoxicated*; (B) As a result, he did not know the wrongfulness of his act or acts." (Emphasis added.) The court distinguished and defined "voluntary intoxication" and "involuntary intoxication."

{¶67} The court also gave the jury a diagram, entitled, "Decision Tree," which is reproduced below:



## Jury Question

{¶68} During deliberations, the jury sent a question to the court. The court summoned counsel and started preparation of a response, which the court deemed necessary because the jury "seemed to be having a difficult time understanding the order of the findings they needed to make, despite the court providing them a 'decision tree' to assist them."

{¶69} Jury question no. 1 stated: "Can you please clarify the element of the law 'A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a

18

high probability of its existence and fails to make inquiry or acts with a <u>conscious</u> purpose to avoid learning the fact.'

{¶70} "Are we supposed to be starting at the top of the decision tree (#1) or wait until the bottom of the decision tree (#2)?

{¶71} "Also can you define the underlined terms?"

{¶72} After extensive discussion with counsel and research, the court ultimately answered the jury question as follows:

{¶73} "Before we started the trial, the defendant was presumed both innocent and sane at the time of the offenses charged. At the conclusion of the evidence, the state must prove beyond a reasonable doubt each and every element of the charged offenses. If the state does prove the existence of the elements beyond a reasonable doubt (question #1 of the decision tree), then the defendant must prove by a preponderance of the evidence the elements of the defense of not guilty by reason of insanity (question #2 of the decision tree). If the state did not prove beyond a reasonable doubt all of the elements of the charged offenses, the verdict must be not guilty. If the state proved beyond a reasonable doubt all of the elements of the charged offenses and the defendant did not prove the defense of insanity, the defendant must be found guilty. If the state proved beyond a reasonable doubt all of the elements of the charged offenses and the defendant did prove by a preponderance of the evidence the defense of insanity, the defendant must be found not guilty by reason of insanity. Refer to the instructions as to the elements of the charged offenses and the defense of insanity.

{¶74} "The words contained within the definition of 'knowingly' must be given the meaning as would be commonly used and understood in the English language, except,

19

of course, for the definition of 'purpose,' which has been separately defined in the instructions.

{¶75} "If I have provided information which you have not already used or considered, please start your deliberations anew with the information provided in this answer to your question."

{¶76} Defense counsel objected to the court's reference to a "presumption of sanity," arguing that while there is a presumption of innocence, it was unclear whether there is a presumption of sanity. The state disagreed, arguing that "[t]he fact that it is an affirmative defense that it must be proven that the Defendant is insane in and out of itself shows that there is a presumption of sanity." After extensively researching the issue, the court concluded there is a presumption of sanity.

## Assignments of Error

{¶77} Mr. Davis raises eight assignments of error on appeal:

{¶78} "[1.] The trial court abused its discretion and committed reversible error when it failed to properly instruct the jury, in violation of the defendant-appellant's rights to due process and fair trial as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Sections 10 and 16, Article I of the Ohio Constitution.

{¶79} "[2.] The trial court committed reversible error by interfering with jury deliberations and in the manner in which it answered a jury question, thus, violating the defendant-appellant's constitutional rights to a fair trial and due process as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Sections 10 and 16, Article I of the Ohio Constitution.

{¶80} "[3.] The trial court abused its discretion and committed reversible error by limiting the number of experts the defense was permitted to call, in violation of the defendant-appellant's rights to compulosry [sic] process, due process and fair trial as guaranteed by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Sections 10 and 16, Article I of the Ohio Constitution.

{¶81} "[4.] The trial court committed plain error when it allowed the state of Ohio to use the defendant-appellant's assertion of his right to remain silent in its case-in-chief and to rebut the defense of insanity, in violation of the defendant-appellant's constitutional rights to remain silent, fair trial and due process as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Sections 10 and 16, Article I of the Ohio Constitution.

{¶82} "[5.] The trial court committed an abuse of discretion when it admitted gruesome death photos that were highly prejudicial and unnecessary, thus violating the defendant-appellant's constitutional rights to fair trial and due process as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Sections 10 and 16, Article I of the Ohio Constitution.

{¶83} "[6.] The trial court erred to the prejudice of the defendant-appellant when it denied his motion for acquittal under Crim.R. 29(A).

{¶84} "[7.] The jury erred to the prejudice of the defendant-appellant when it returned a verdict of guilty on all counts, against the manifest weight of the evidence.

{¶85} "[8.] The trial court erred by sentencing the defendant-appellant to serve individual, maximum prison terms consecutively when the consecutive sentences were unsupported by the record and thus, contrary to law."

21

**Jury Instructions**

{¶86} In his first assignment of error, Mr. Davis first contends the trial court should have instructed the jury on the lesser included offenses for murder and felonious assault. He secondly contends that the trial court should not have included the affirmative defense of involuntary intoxication within the insanity instruction because it is a legally separate and distinct affirmative defense.

{¶87} After arguments are completed, a trial court must fully and completely give the jury all instructions which are relevant and necessary for the jury to weigh the evidence and discharge its duty as the fact finder. *State v. Petway*, 2020-Ohio-3848, 156 N.E.3d 467, ¶ 40 (11th Dist.); *State v. Comen*, 50 Ohio St.3d 206 (1990), paragraph two of the syllabus (construing Crim.R. 30(A)).

{¶88} Requested jury instructions should ordinarily be given if they are correct statements of law, if they are applicable to the facts in the case, and if reasonable minds might reach the conclusion sought by the requested instruction. *Petway* at ¶ 40. The court may refuse to give an instruction as to a matter which is not applicable to the facts governing the case. *State v. Scott*, 26 Ohio St.3d 92, 101 (1986).

### *Jury Instructions on Lesser Included Offenses*

{¶89} A lesser-included-offense instruction is not warranted every time "some evidence" is offered to support the lesser offense. *State v. Bolden*, 11th Dist. Lake No. 2014-L-121, 2016-Ohio-4727, ¶ 51; *State v. Shane,* 63 Ohio St.3d 630, 632 (1992). Rather, there must be "sufficient evidence" to allow the jury to acquit the defendant on the indicted offense and to find him guilty on a lesser included offense. *Bolden* at ¶ 51; *Shane* at 632-633. Whether the evidence presented at trial is sufficient to require a

22

particular instruction is a determination that falls within the sound discretion of the trial court. *Bolden* at ¶ 51. As a result, this court will not disturb a ruling of the trial court absent an abuse of discretion. *Id.*

{¶90} An abuse of discretion is a term of art, connoting judgment exercised by a court, which does not comport with reason or the record. *State v. Ferranto*, 112 Ohio St. 667, 676-678 (1925). Stated differently, an abuse of discretion is the trial court's "'failure to exercise sound, reasonable, and legal decision-making.'" *State v. Beechler*, 2d Dist. Clark No. 09-CA-54, 2010-Ohio-1900, ¶ 62, quoting *Black's Law Dictionary* 11 (8th Ed.Rev.2004).

{¶91} We acknowledge, however, that the Supreme Court of Ohio has also held that a charge on a lesser included offense is required when the facts warrant it. *Bolden* at ¶ 51; *see State v. Wine,* 140 Ohio St.3d 409, 2014-Ohio-3948, ¶ 20. It is obviously difficult to reconcile these two concepts. On the one hand, an instruction is required if warranted by the evidence. Yet, on the other, the court has discretion to refuse to give it. Despite this apparent inconsistency, the court in *Wine* made it clear that discretion remains a part of the standard of review. The court held that whether to give a jury instruction on a lesser-included offense lies within the discretion of the trial court and depends on whether the evidence could reasonably support a jury finding of guilty on a lesser-included offense. *Id.* at ¶ 1.

{¶92} Mr. Davis erroneously contends that the court concluded that "if a defendant offers a complete defense to all elements of a crime charged, then the defendant does not get the benefit of lesser included offense jury instructions."

23

{¶93} A review of the trial transcript reveals the court made this statement in a conference with counsel in relation to an Eighth District case, *State v. Braxton*, 102 Ohio App.3d 28 (8th Dist.1995). The following day, the court again conferred with counsel on the issue and agreed with the state that there was no evidence to support instructions on lesser included offenses because "the only thing in the record is that it's purposeful or knowing conduct."

{¶94} "'Even though an offense may be statutorily defined as a lesser included offense of another, a charge on such lesser included offense is required only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense.'" *State v. Hall*, 11th Dist. Trumbull No. 2017-T-0032, 2019-Ohio-1719, ¶ 26, quoting *State v. Thomas*, 40 Ohio St.3d 213 (1988), paragraph two of the syllabus; *see State v. Wilkins*, 64 Ohio St.2d 382, 387 (1980) ("The mere fact that an offense can be a lesser included offense of another offense does not mean that a court must instruct on both offenses where the greater offense is charged").

{¶95} We find no abuse of discretion in the court's conclusion or application of the law. A review of the evidence at trial reveals the evidence did not support an instruction on the lesser included offenses because there was no evidence Mr. Davis acted recklessly or negligently – he fully intended to swerve into Mr. Morawski's vehicle.

### Involuntary Intoxication Jury Instruction

{¶96} Mr. Davis also contends the trial court erred by instructing the jury on involuntary intoxication as a part of the insanity instruction when it is a separate and distinct affirmative defense.

24

{¶97} Mr. Davis argues that the Ohio Jury Instructions provide that insanity and involuntary intoxication are two separate and distinct potential affirmative defenses; thus, it was error to merge the instructions.

{¶98} *Ohio Jury Instructions*, CR Section 417.27 (Rev. Apr. 13, 2019)[2], "Affirmative Defense," Comment 2 provides:

{¶99} "A defense involving an excuse or justification peculiarly within the knowledge of the accused, on which the accused can fairly be required to adduce supporting evidence (for example, that the defendant acted for specified lawful purposes in a charge of abusing harmful intoxicants under R.C. 2925.31). *Intoxication (rendering a defendant incapable of forming the criminal purpose in question), duress, and insanity are affirmative defenses.*" (Emphasis added.)

{¶100} *Ohio Jury Instructions*, CR Section 421.25 (Rev. Apr. 13, 2019), "Insanity," states:

{¶101} "The plea of not guilty by reason of insanity raises the issue of the insanity of the defendant at the time of the commission of the act. To establish the defense of insanity, the defendant must prove by the greater weight of the evidence that at the time of the offense, he/she did not know, as a result of a severe mental disease or defect, the wrongfulness of his/her act. It is not a defense that the defendant's reason, at the time of the offense, was so impaired that he/she did not have the ability to refrain from doing his/her act or acts."

{¶102} Thus, Mr. Davis contends involuntary intoxication refers to a condition that renders a defendant incapable of formulating culpability, i.e., purpose, whereas insanity

---

[2] *Ohio Jury Instructions*, CR Section 417.27 was subsequently amended on August 5, 2020, but the amendments have no bearing on the assignment of error at issue.

refers to a condition where the defendant cannot know the wrongfulness of his acts, regardless of purpose or culpability. In support of his argument, Mr. Davis cites the pattern jury instruction defining "intoxication," which makes no distinction between "voluntary intoxication" and "involuntary intoxication." Voluntary intoxication is not a defense in Ohio. R.C. 2945.391 ("Proof that a person's reason, at the time of the commission of an offense, was so impaired that the person did not have the ability to refrain from doing the person's act or acts, does not constitute a defense"). Mr. Davis's argument appears to be that there is some oversight in the OJI instructions, and the defense of involuntary intoxication is a separate and distinct affirmative defense from NGRI.

{¶103} We agree with Mr. Davis that involuntary intoxication is a separate and distinct affirmative defense from NGRI, but there must be evidence in this case to support a separate and distinct involuntary intoxication instruction.

{¶104} In conference with counsel, the court considered whether there was sufficient evidence in the case to support an instruction on involuntary intoxication as a separate and distinct legal defense. After noting that the experts in the case did not distinguish Mr. Davis's medication as a separate cause of his act apart from his mental illness, the court remarked: "For the jury to take the involuntary intoxication by itself, they would also have to decide that his mental disease had nothing to do with it. They would have to make that finding, his mental disease had nothing to do with it. Now, I know alternative defenses are put out there, but the alternative defense has to have some evidence to support it." Thus, the court concluded that under the evidence in this case, involuntary intoxication should be instructed as "an arm of the NGRI defense."

26

{¶105} As previously noted, jury instructions must "present a correct, pertinent statement of the law that is appropriate to the facts." *State v. White,* 142 Ohio St.3d 277, 2015-Ohio-492, ¶ 46; *State v. Griffin,* 141 Ohio St.3d 392, 2014-Ohio-4767, ¶ 5; *State v. Lessin,* 67 Ohio St.3d 487, 493 (1993).

{¶106} A jury instruction regarding an affirmative defense is only required when the defendant has produced sufficient evidence to raise a question in the minds of reasonable jurors about the existence of the affirmative defense. *State v. Jackson*, 2017-Ohio-278, 81 N.E.3d 942, ¶ 23. "If the evidence generates only a mere speculation or possible doubt, * * * submission of the issue to the jury will be unwarranted." *State v. Getsy,* 84 Ohio St.3d 180, 198-199 (1988).

{¶107} We find no error in the court's jury instructions because the evidence introduced at trial did not support a separate and distinct legal defense of involuntary intoxication, apart from NGRI. The evidence of Mr. Davis's involuntary intoxication and its effect on his actions and his mental state was intertwined with his underlying mental illness and was a factor, but not the sole factor, supporting his insanity defense that he could not appreciate the wrongfulness of his actions.

{¶108} Even if the court had separately instructed the jury, we cannot say the result would have been different because the jury was given the correct instruction of law regarding involuntary intoxication.

{¶109} Mr. Davis's first assignment of error is without merit.

### Jury Deliberations

{¶110} In his second assignment of error, Mr. Davis contends the trial court committed reversible error and abused its discretion by providing the jury with a decision

27

tree and then later answering a jury question in a "manner that was overreaching and nonresponsive."

### Decision Tree Diagram

{¶111} Because Mr. Davis did not object to providing the jury a decision tree, we review under a plain error standard of review.

{¶112} Crim.R. 30(A) provides, in relevant part, that "a party may not assign as error the giving or the failure to give any instructions unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection." This court has held that where an appellant fails to object to the jury instructions at trial, absent plain error, he waives any right to appeal this issue. *State v. Turner*, 11th Dist. Lake No. 2015-L-116, 2016-Ohio-4733, ¶ 48; *see State v. Underwood,* 3 Ohio St.3d 12 (1983), syllabus.

{¶113} Further, Crim.R. 52(B) allows us to correct "[p]lain errors or defects affecting substantial rights" that were not brought to the attention of the trial court. *Turner* at ¶ 49. In *State v. Barnes,* 94 Ohio St.3d 21 (2002), the Supreme Court of Ohio set forth very strict limitations on what constitutes plain error. First, there must be an error, i.e., a deviation from a legal rule. *Id.* at 27. Second, the error must be plain, i.e., the error must be an "obvious" defect in the proceedings. *Id.* Third, the error must have affected "substantial rights." *Id.* In *State v. Payne,* 114 Ohio St.3d 502, 2007-Ohio-4642, the Supreme Court of Ohio held that the defendant has the burden of demonstrating plain error. *Id.* at ¶ 17.

{¶114} The "decision tree" diagram dissected the questions the jury was required to answer, i.e., did the state prove all of the elements beyond a reasonable doubt? If yes,

28

did the defense prove, by a preponderance of the evidence, the defense of insanity? We find it was an accurate statement of the law and provided a roadmap for the jury to complete the verdict forms appropriately in their consideration of the eight counts and the NGRI affirmative defense.

### Jury Question

{¶115} Mr. Davis further contends the trial court erred in the manner it responded to the jury's question, "Are we supposed to be separating the defendant's mental state from the law starting at the top of the decision tree (#1) or wait until the bottom of the decision tree (#2)?" More specifically, he contends the trial court gave the jury a new instruction on the "presumption of sanity," which defense counsel was prevented from discussing in closing argument.

{¶116} "'Where, during the course of its deliberations, a jury requests further instruction, or clarification of instructions previously given, a trial court has discretion to determine its response to that request.'" *State v. Williams*, 11th Dist. Ashtabula No. 2001-A-0044, 2002-Ohio-6919, ¶ 35, quoting *State v. Carter*, 72 Ohio St.3d 545 (1995), paragraph one of the syllabus; *see also State v. Kirin*, 11th Dist. Trumbull No. 99-T-0054, 2000 WL 1140261, *3 (Aug. 11, 2000). Thus, a reversal of a criminal conviction based upon a trial court's response to such a request from the jury requires a showing that the lower court committed an abuse of discretion. *Williams* at ¶ 35.

{¶117} A review of the court's answer to the jury's question reveals the court simply reiterated the jury instructions (as did the decision tree) that the jury was required to: first, determine if the state proved beyond a reasonable doubt all of the elements charged, and if so, second, determine if Mr. Davis had proved the defense of insanity by a

29

preponderance of the evidence. The court did not include a new instruction on "the presumption of insanity." Instead, it stated, "Before we started the trial, the defendant was presumed both innocent and sane at the time, of the offenses charged." This is merely an express affirmation of a presumption that exists at the beginning of all criminal trials. We do not agree this constituted the introduction of a new instruction or that the trial court was "essentially non-responsive to the question asked" and/or "interfered with the role of the jurors."

{¶118} As the trial court found and noted in its judgment entry documenting the jury question and the court's response, "[s]anity and competence *are generally presumed*. Thus, one who challenges the presumption of sanity or competence must bear the burden of proof to challenge that presumption." (Emphasis added.) *State v. Lott*, 97 Ohio St.3d 303, 2002-Ohio-6625, ¶ 21, *overruled on other grounds, State v. Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539; *see also* R.C. 2945.37(G), R.C. 2901.05(C)(2), and R.C. 2901.01(A)(14) (placing burden on accused to prove incompetence to stand trial, to prove an affirmative defense, and to prove insanity, all by a preponderance); *State v. Curry*, 45 Ohio St.3d 109, 115 (1989) (upholding the trial court's finding that the defendant failed to overcome the presumption of sanity).

{¶119} Mr. Davis cites to *State v. Harvey*, 11th Dist. Lake No. 95-L-192, 1997 WL 269195 (May 2, 1997), which is not applicable to the present case. In *Harvey*, the court gave extraneous instructions on the issue of causation that were not applicable to the facts of that case. *Id.* at *3. The jury sent a question directly addressing the information in the extraneous instructions, which the court failed to answer. *Id.* We found the court should have answered the question, specifically by telling the jury that "if they were not

30

convinced beyond a reasonable doubt that appellant's bullet killed [the victim], they must find him not guilty of aggravated murder." *Id.* Thus, we found the trial court abused its discretion by leaving the jury to struggle with instructions which were, in light of the facts, extraneous and confusing without clarification or a response from the court. *Id.*

{¶120} Having found the trial court did not abuse its discretion in providing the jury a decision tree and in its response to the jury's question, we find Mr. Davis's second assignment of error is without merit.

### Expert Witnesses

{¶121} In Mr. Davis's third assignment of error, he contends the trial court abused its discretion in precluding the testimony and evidence of draft reports from Dr. Calabrese, an expert the state enlisted to provide a sanity opinion. Mr. Davis also argues the trial court erred in excluding defense expert Dr. Glass on the grounds that his opinion testimony was "inextricably intermingled with a finding of diminished capacity."

{¶122} "When assessing the admissibility of expert testimony, the threshold question to determine is whether the testimony is relevant under Evid.R. 401. Relevant evidence is defined as 'evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.' Evid.R. 401. These provisions produce a low threshold of admissibility, which 'reflect[s] the policy favoring the admission of relevant evidence for the trier of fact to weigh.'" *State v. West*, 2017-Ohio-4055, 91 N.E.3d 365, ¶ 77 (5th Dist.), quoting *State v. Kehoe*, 133 Ohio App.3d 591, 606 (12th Dist.1999).

31

{¶123} Relevant evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury. Evid.R. 403(A).

{¶124} If the testimony satisfies the threshold determination of relevancy and admissibility, our inquiry transitions to the dictates of Evid.R. 702, which provides, in pertinent part, as follows:

{¶125} "A witness may testify as an expert if all of the following apply:

{¶126} "(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

{¶127} "(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

{¶128} "(C) The witness' testimony is based on reliable scientific, technical, or other specialized information."

{¶129} One has specialized knowledge if one "'has information which has been acquired by experience, training or education which would assist the trier of fact in understanding the evidence or a fact in issue.'" *West* at ¶ 80, quoting *State v. Nemeth*, 82 Ohio St.3d 202, 211 (1998). The determination of whether a witness possesses specialized knowledge so as to be permitted to testify as an expert is within the sound discretion of the trial court. *Id.*

{¶130} When performing this analysis, we are mindful that "'courts should favor the admissibility of expert testimony whenever it is relevant and the criteria of Evid.R. 702 are met.'" *Id.* at ¶ 81, quoting *Nemeth* at 207. "'Furthermore, even if the exclusion of the

evidence were error, reversal is warranted only on a showing of prejudice to the accused.'" *Id.*, quoting *State v. Layton,* 6th Dist. Lucas No. L-90-345, 1992 WL 37774, *4 (Feb. 28, 1992).

{¶131} In determining the admissibility of an expert witness's testimony, a court must consider whether that witness will aid the trier of fact in search of the truth. *Id.* at ¶ 82; *Alexander v. Mt. Carmel Med. Ctr.*, 56 Ohio St.2d 155, 159 (1978); *State v. Clark*, 101 Ohio App.3d 389, 411 (8th Dist.1995).

{¶132} Evidentiary rulings are generally within the broad discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. *West* at ¶ 38; *see also State v. Thomas*, 11th Dist. Lake No. 2019-L-085, 2020-Ohio-4635, ¶ 43 ("A trial court's ruling on evidentiary issues, including the admissibility of expert opinions, will not be reversed on appeal absent an abuse of discretion and proof of material prejudice").

{¶133} While we apply an abuse of discretion standard to evidentiary rulings on matters such as relevance and the admission of expert testimony, the trial court does not have the discretion to admit evidence that is clearly not permitted by law; thus for those matters, such as whether testimony constitutes hearsay, we apply a de novo standard of review. *State v. Tackett*, 11th Dist. Ashtabula No. 2018-A-0052, 2019-Ohio-5188, ¶ 50-51.

### *Dr. Calabrese*

{¶134} Mr. Davis first contends that the trial court erred in excluding the testimony of Dr. Calabrese without holding a hearing.

33

{¶135} In granting the state's motion, the court concluded that "the State asked for an opinion, and [Dr. Calabrese] used the wrong standard. He told different stories to the State, one orally and one in writing, and this would require my having a trial within a trial on just the issue of that witness, which has nothing to do with this case. The State's motion is granted. Calabrese won't be mentioned in this case."

{¶136} We agree with the trial court that an expert employing the wrong legal standard is not relevant pursuant to Evid.R. 401(A). Even if it were relevant, it was properly excluded pursuant to Evid.R. 403(A), since its probative value would be "substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence."

{¶137} The cases Mr. Davis cites in support of his argument do not present the same issues we confront here -- where the expert was unable to apply the correct legal standard and render an opinion.

{¶138} For instance, in *State v. Spisak*, 8th Dist. Cuyahoga Nos. 47458 & 47459, 1984 WL 13992 (July 19, 1984), the expert's testimony was stricken because it was irrelevant to the issue of legal insanity since the expert indicated the defendant was legally sane at the time of the acts. *Id.* at *4.

{¶139} Likewise, in *State v. Reynolds*, 2017-Ohio-1478, 89 N.E.3d 235 (6th Dist.), the expert who testified did not give an ultimate opinion, remarking that it was a "close call" and should be resolved by a trier of fact, but that there was "at least some partial evidence that [the appellant] did not know the wrongfulness of his act." *Id.* at ¶ 38.

34

{¶140} Lastly, in *State v. Ramos*, 8th Dist. Cuyahoga No. 103596, 2016-Ohio-7685, the experts were discussing whether the appellant "appreciated the wrongfulness of his acts." *Id.* at ¶ 30.

{¶141} Thus, none of the experts in those cases were excluded because they could not understand or utilize the correct legal standard and render an opinion.

{¶142} We cannot say the trial court abused its discretion in determining Dr. Calabrese's testimony should be excluded under these circumstances.

### Dr. Glass

{¶143} The basis for the trial court's exclusion of Dr. Glass's testimony was that he did not distinguish the legal test for insanity from diminished capacity in formulating an opinion as to Mr. Davis's sanity.

{¶144} R.C. 2945.391, entitled, "applicability of not guilty by reason of insanity plea; impairment of reason not defense," provides, in relevant part, that "[p]roof that a person's reason, at the time of the commission of an offense, was so impaired that the person did not have the ability to refrain from doing the person's act or acts, does not constitute a defense."

{¶145} We do not find an abuse of discretion in the trial court's determination that Dr. Glass inextricably intermingled his opinion that Mr. Davis suffered from a severe mental illness with psychosis on the day of the collision with a finding of diminished capacity. A review of the hearing transcript reveals there was some confusion as to whether Dr. Glass understood the distinction between the "impairment" of diminished capacity and "severe mental disease or defect" for insanity, as he alternated between the two and did not distinguish between them.

35

{¶146} The following colloquy during the motion in limine hearings demonstrates this confusion:

{¶147} "[Defense Counsel:] Dr. Glass, I guess I'm still focused on one word, the word 'impairment' and what that means. You had indicated a moment ago that you misunderstood the use of the word 'impairment' as it relates to this inquiry. I'm just going to—because I think there's a little confusion – just ask you again. Was there – Did you find that Michael Davis suffered a mental disease on July 4, 2017, at the time of the collision?

{¶148} "[Dr. Glass:] Yes.

{¶149} "[Defense Counsel:] Was it that mental disease or impairment, as the Court and the State have read to you, that prevented him from appreciating the wrongfulness of his conduct at the time of the collision on July 4, 2017?

{¶150} "[Dr. Glass:] In my medical opinion, it was his mental disease and not an impairment from some substance.

{¶151} "[Defense Counsel:] The judge was asking about an impairment of a psychological condition. I apologize if I didn't get your wording exact. I think you had said 'mental health.'

{¶152} "[The Court:] I'm not talking an introduced impairment, an intoxicant or an overdose by a drug. I'm talking about the impairment of his reason by a mental disease. So, does the impairment of his reason by some mental disease render him incapable of refraining from what he did?"

{¶153} "[Defense Counsel:] Judge, if I may. I'm trying to get the right question here. I'm not trying to argue with the Court at all, but I don't understand, frankly. If someone

36

has a mental disease to the point that it is a severe mental disease, isn't impairment inherent in that?

{¶154} "[The Court:] If someone has a severe –

{¶155} "[Defense Counsel:] -- severe mental disease.  Isn't that in and of itself an impairment?

{¶156} "[The Court:] Yes.

{¶157} "[Defense Counsel:] Okay; so, I'm just trying to figure it out.

{¶158} "[The Court:] But the point, as it relates to the statute, is, are we talking that this command was so irresistible that he could not refrain from doing what he was commanded to do?  Do you understand that question?

{¶159} "[Dr. Glass:]  I believe the command was such that he could not obey it at that time.

{¶160} "[Defense Counsel:] I'm sorry; your answer was . . .?

{¶161} "[Dr. Glass:]  That he had to obey the command.  His mental incapacity, mental illness, his psychosis was such that he could not…that the [sic] had to obey the command.

{¶162} "[Defense Counsel:] Was the mental disease so severe, so overwhelming that he was unable to appreciate the wrongfulness of his conduct?

{¶163} "[Dr. Glass:]  Yes, I believe it was.

{¶164} "[Defense Counsel:] And do you see that as different than the question posed to you by the Court a moment ago?

{¶165} "[Dr. Glass:]  I'm having trouble –"

{¶166} The state argued that Dr. Glass could not disassociate voluntary intoxication or diminished capacity in rendering an opinion. A review of Dr. Glass's testimony supports this argument, and we find no error in the trial court's exclusion of this expert's testimony at trial pursuant to Evid.R. 403(A). We cannot say the trial court abused its discretion in determining that the probative value of his testimony was substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury. Dr. Glass did not conform his opinion to the legal standard of insanity.

{¶167} As the Fourth District observed in *State v. Wong,* 95 Ohio App.3d 39 (4th Dist.1994), "[i]nitially, we note that a close reading of the transcript reveals that the trial court did not issue a ruling that would have prevented counsel from offering the testimony of [the expert doctor witnesses] to prove insanity. Instead, the trial court prevented the doctors from taking the stand to testify as to appellant's ability to form the necessary intent to commit felonious assault, i.e., diminished capacity." *Id.* at 47. Similarly here, the trial court prevented Dr. Glass from testifying as to Mr. Davis's diminished capacity rather than the legal test for insanity.

{¶168} Mr. Davis's third assignment of error is without merit.

**Mr. Davis's Statement to the Investigators**

{¶169} In his fourth assignment of error, Mr. Davis argues that the state improperly elicited testimony regarding his post-*Miranda* silence as evidence of guilt during the state's direct examination of Det. Parmertor. He also asserts that in closing argument, the prosecutor "relied heavily" on Mr. Davis's statement -- that he did not want to say something in this interview that would "not match up with something [he would] say another day" -- to rebut Mr. Davis's insanity defense. Mr. Davis argues that the use of his

38

post-*Miranda* silence may not be used as evidence of his sanity and constitutes reversable error.

{¶170} Mr. Davis acknowledges that defense counsel failed to object to the use of this statement at trial. Thus, we also review this assignment of error for plain error.

{¶171} Before we can consider whether the prosecutor erroneously used Mr. Davis's post-*Miranda* silence as evidence of his sanity at the time of the offense, we must determine whether he invoked his right to remain silent.

{¶172} Missing in Mr. Davis's statement to the detectives was an invocation of his right to remain silent. In fact, he was willing to "put down" an "ironclad statement," just not at that particular moment. Mr. Davis did not express a wish to remain silent or to speak with an attorney, nor did he refuse to answer the detectives' questions, either explicitly or implicitly.

{¶173} Although a suspect "need not 'speak with the discrimination of an Oxford don,'" a suspect "must articulate his or her desire to remain silent or cut off questioning 'sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be' an invocation of the right to remain silent." *State v. Murphy*, 91 Ohio St.3d 516, 520, quoting *State v. Ross*, 203 Wis.2d 66, 78 (Wis.1996), quoting *Davis* 459; see, also, *United States v. Mikell*, 102 F.3d 470, 476 (C.A. 11, 1996). If the suspect says something that may or may not be an invocation of the right, police may continue to question him; they need not treat the ambiguous statement as an invocation or try to clear up the ambiguity. *Id.*; *see Ross* at 432; *State v. Owen*, 696 So.2d 715, 717–718 (Fla.1997); *State v. King* (Me.1998), 708 A.2d 1014, 1017 (Me.1998). Thus, "appellant's

claim turns on whether his statement was an unambiguous invocation of his right to stop talking." *Id.*

{¶174} The Second District confronted a similar situation in *State v. Gray*, 2d Dist. Montgomery No. 27207, 2017-Ohio-563. The court found that the trial court erred in suppressing the incriminating statements the defendant made based on a perceived violation of his right to remain silent. *Id.* at ¶ 11. The court determined that the defendant's statement about wanting to "leave it like that" was "at most ambiguous as to whether he had nothing more to say about a particular question or whether he more broadly desired to terminate the interview." *Id.* at ¶ 10.

{¶175} The court noted that "a suspect expressing a desire not to elaborate on a prior answer because he has nothing else to say about it is not the same as expressing a desire to invoke the right to remain silent and to terminate the interview." *Id.* at ¶ 11. *See State v. Blythe*, 2d Dist. Montgomery No. 24961, 2013-Ohio-1688, ¶ 22, quoting *State v. House*, 54 Ohio St.2d 297, 299–300 (1978), quoting *State v. Anspaugh*, 547 P.2d 1124 (Idaho 1976) (finding no rescission of a *Miranda* waiver where in response to a certain question the defendant stated that he would "rather not make any other comments at this time"). Because [the defendant] never unambiguously invoked his right to remain silent, the trial court erred in suppressing the incriminating statements he made based on a perceived violation of that right.) *See also State v. White*, 2d Dist. Montgomery No. 27749, 2018-Ohio-3076, ¶ 27 (holding it was not a clear and unambiguous invocation of the right to remain silent where the suspect expressed that he "really do[es]n't now even want to answer any questions").

40

{¶176} "Invocation of the *Miranda* right to [remain silent] 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire [to cease all questioning].'" *Davis* at 459, quoting *McNeil v. Wisconsin*, 501 U.S. 171, 178, (1991).

{¶177} Since we do not find Mr. Davis invoked his right to remain silent by informing the detectives that he would give them an "ironclad statement" at a later time, the use of his statement during Det. Parmertor's testimony and in the prosecutor's closing argument could not have been a "misuse of his right to remain silent as evidence of his guilt and sanity," as Mr. Davis contends.

{¶178} Mr. Davis's fourth assignment of review is without merit.

### Gruesome Photographs

{¶179} In his fifth assignment of error, Mr. Davis contends the trial court abused its discretion when it allowed the admission of gruesome photographs of Mr. Morawski and the crime scene, as well as photographs from the autopsy that were "repetitive, highly prejudicial, and unnecessary."

{¶180} A gruesome photograph is admissible only if its "'probative value * * * outweigh[s] the danger of prejudice to the defendant.'" *Ford*, *supra*, at ¶ 237. Moreover, even a photo that satisfies the balancing test is inadmissible if it is repetitive or cumulative. *Id.; see State v. Thompson*, 33 Ohio St.3d 1, 9 (1987). A trial court's decision that a photo satisfies the standard is reviewable only for abuse of discretion. *Ford* at ¶ 237*; see State v. Vrabel,* 99 Ohio St.3d 184, 2003-Ohio-3193, ¶ 69. *See also State v. York*, 11th Dist. Portage No. 94-P-0111, 1996 WL 200596, *3 (Jan. 26, 1996) ("Under Evid.R. 403, the admission of graphic photographs is a matter within the trial court's sound discretion").

41

{¶181} The admitted photographs depicted the scene of the collision, including one blurry photograph of Mr. Morawski pinned inside the vehicle after the fire department removed the roof and parts of the front of the vehicle. The other photographs were taken during Mr. Morawski's autopsy and showed his injuries.

{¶182} We do not find an abuse of discretion in the court's determination. The state was sensitive in their selection of the photographs. The photographs were probative, illustrative of the scene of the collision, and showed the extent of Mr. Morawski's injuries. Further, they were not duplicative or cumulative in nature. Each identified a specific injury.

{¶183} As the Supreme Court of Ohio so aptly stated in *Ford, supra*:

{¶184} "Although we find no prejudice here, we caution trial courts to closely scrutinize the crime-scene and autopsy photos that are offered as exhibits in murder trials. The admission of gruesome photos exposes the jurors to horrific images, and when those photographs go to an element of the offense that is clearly proven by other evidence, they serve no useful purpose whatsoever. Instead, such exposure only serves to inflame the passions of jurors and risks subjecting them to harm. A few crime-scene photos showing the body along with the coroner's testimony will often suffice." *Id.* at ¶ 257.

{¶185} Mr. Davis's fifth assignment of error is without merit.

## Sufficiency of the Evidence

{¶186} In his sixth assignment of error, Mr. Davis submits that the trial court erred in denying his Crim.R. 29 motion for judgment of acquittal because the state failed to provide sufficient evidence of the requisite mens rea for murder and felonious assault, which are, respectively, purposely and knowingly. Mr. Davis submits that there was insufficient evidence to prove that he purposely intended to cause the death of Mr.

42

Morawski and that the evidence is "unclear" that he was aware of the probable result of his conduct; rather, his intent was only to end his own life.

{¶187} "'[T]he standard of review for a sufficiency of the evidence claim is "whether after viewing the probative evidence and the inference[s] drawn therefrom in the light most favorable to the prosecution, any rational trier of fact could have found all the elements of the offense beyond a reasonable doubt. The claim of insufficient evidence invokes an inquiry about due process. It raises a question of law, the resolution of which does not allow the court to weigh the evidence." * * * 'In essence, sufficiency is a test of adequacy[;] [w]hether the evidence is legally sufficient to sustain a verdict * * *.'" *State v. Rice*, 2019-Ohio-1415, 135 N.E.3d 309, ¶ 65, quoting *State v. McFeely*, 11th Dist. Ashtabula No. 2008-A-0067, 2009-Ohio-1436, ¶ 23. "'Sufficiency of the evidence tests the burden of production.'" *Id.*, quoting *McFeely* at ¶ 23.

{¶188} At the outset, we note that the four counts of felonious assault merged into count six (attempted murder) for purposes of sentencing. Therefore, we only discuss the sufficiency of the evidence for the mens rea of "purposely" for murder, which necessarily includes the lesser mens rea of "knowingly." *See State v. Rafter*, 8th Dist. Cuyahoga No. 106787, 2019-Ohio-529, ¶ 10 (holding that any error on merged counts is harmless).

{¶189} Mr. Davis was convicted of murder in violation of R.C. 2903.02(A), and attempted murder in violation of R.C. 2923.02 and R.C. 2903.02(A). Pursuant to R.C. 2903.02(A), "[n]o person shall purposely cause the death of another * * *." Per R.C. 2923.02(A), which governs "attempt," "[n]o person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in the offense."

43

{¶190} Pursuant to R.C. 2901.22(A), "[a] person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender tends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature."

{¶191} A review of the state's evidence reveals more than sufficient evidence from which a jury could find Mr. Davis purposely crossed the center lane and collided his vehicle into an oncoming car in the opposite lane.  It is inconsequential whether Mr. Davis wanted to commit suicide or murder; he intended to engage in the homicidal conduct of operating his vehicle at the excessive speed of 70 mph with the intent to collide headfirst with another vehicle.

{¶192} The state introduced evidence of Mr. Davis's own remarks to the police and medical personnel in the days following the collision, which indicated that he intended to drive into an oncoming vehicle crossing the center line at an excessive speed.  In fact, there was no evidence that Mr. Davis tried to stop his vehicle after he turned into the trajectory of Mr. Morawski's oncoming car, and evidence showed he fully intended to hit that vehicle.

{¶193} The Eighth District considered a similar sufficiency argument in *Rafter*, *supra*.  In that case, the appellant was driving the wrong way on an interstate highway, when he struck another vehicle at high speed, instantly killing the sole occupant.  *Id.* at ¶ 1.  The appellant had ongoing mental issues and suicidal thoughts.  Shortly before the crash, he telephoned his son to tell him he loved him and "that he's going to drive into a wall." *Id.*

{¶194} The court explained that "[w]hat [the appellant] is really arguing is that in trying to kill himself by colliding with another vehicle, he did not desire the victim's death. 'Deliberately to do something that one knows will have a particular result is often in the criminal law enough to establish the requisite intention to bring about that result.' *United States v. Gage*, 183 F.3d 711, 718-719 (7th Cir.1999) (Posner, J., concurring). But whether [the appellant] 'desired' the victim's death is immaterial; he knew that the manner in which he would take his life would bring about her death, too. *See id.* A rational trier of fact could conclude that [the appellant] purposely collided with the victim's vehicle. A rational trier of fact could also conclude that [the appellant] knew that at the high rate of speed he was traveling, a collision with another vehicle that was severe enough to cause his death would surely cause the death of the driver of the other vehicle." *Id.* at ¶ 8.

{¶195} Similarly here, a rational trier of fact could conclude that Mr. Davis knew that the high rate of speed he was traveling at in order to collide with another vehicle was severe enough to cause his own death – and would surely cause the death of the driver of the other vehicle.

{¶196} Mr. Davis's sixth assignment of error is without merit.

**Manifest Weight of the Evidence**

{¶197} In his seventh assignment of error, Mr. Davis contends the manifest weight of the evidence does not support the jury's verdicts. He contends that the defense introduced substantial proof that he was suffering from sleep deprivation and was hearing command hallucinations. Further, he argues no one disputed that he suffered from a mental disease and there was expert testimony that one in a psychotic state does not know right from wrong. He argues that the state's evidence centered around his day-to-

day activities and the manner in which he was driving the car at the time of the collision, to which a defense expert countered that people could still perform rational activities while operating in a psychotic state.

{¶198} Mr. Davis also argues there was substantial evidence that he did not know the wrongfulness of his conduct because of involuntary intoxication caused by the abrupt cessation of Latuda and reintroduction of Seroquel at an amount that reached a substantially higher dosage at the time of the incident.

{¶199} "'When reviewing a claim that a judgment was against the manifest weight of the evidence, an appellate court must review the entire record, weigh both the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving conflicts, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that a new trial must be ordered.'" *Rice, supra,* at ¶ 81, quoting *McFeely, supra*, at ¶ 77.

{¶200} "'The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against a conviction. * * * The role of the appellate court is to engage in a limited weighing of the evidence introduced at trial in order to determine whether the state appropriately carried its burden of persuasion. * * * The reviewing court must defer to the factual findings of the trier of fact as to the weight to be given to the evidence and credibility of witnesses." *Id.* at ¶ 82, quoting *McFeely* at ¶ 78.

{¶201} Based on the evidence and testimony at trial, we cannot conclude the jury so lost its way or created a manifest miscarriage of justice. Mr. Davis's arguments go to the credibility of the testimony of witnesses and evidence at trial. From the state's

evidence presented, a jury could find that Mr. Davis intentionally crossing the center lane and driving into an oncoming car at an excessively high speed would be severe enough to cause death. Simply because a defense expert testified to the contrary of the state's theory of the case does not mean the manifest weight of the evidence does not support the verdict.

{¶202} An insanity defense ultimately rests on the credibility and persuasiveness of the expert's testimony. The jury heard extensive testimony from defense and prosecution witnesses qualified to give opinions as to mental illness, psychosis, and its effect on one's ability to appreciate right from wrong, and the pharmacological impact of the dosing and timing of administration of Mr. Davis's various medications during the period of time leading to the day of the incident and on the day of the incident itself.

{¶203} "'It is well-settled that when assessing the credibility of witnesses, "[t]he choice between the credibility of witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact." * * * Furthermore, if the evidence is susceptible to more than one interpretation, a reviewing court must interpret it in a manner consistent with the verdict.'" *Id.* at ¶ 84, quoting *McFeely* at ¶ 81.

{¶204} In sum, the jury was free to believe the version of events and the opinions regarding Mr. Davis's sanity at the time of the incident presented by the evidence and testimony of the state's witnesses.

{¶205} Mr. Davis's seventh assignment of error is without merit.

**Consecutive Sentences**

47

{¶206} In his eighth and final assignment of error, Mr. Davis contends the trial court erred when it sentenced him to serve consecutive sentences for a total prison term of 26 years to life because the trial court's findings were not supported by the record and were contrary to law pursuant to R.C. 2929.14(C).

{¶207} The standard of review for the imposition of consecutive prison terms is governed by the clearly and convincingly standard set forth in R.C. 2953.08(G)(2). *See State v. Gwynne*, 158 Ohio St.3d 279, 2019-Ohio-4761, ¶ 16.

{¶208} R.C. 2929.41(A) provides, in pertinent part: "Except as provided in * * * division (C) of section 2929.14, * * * a prison term, jail term, or sentence of imprisonment shall be served concurrently with any other prison term, jail term, or sentence of imprisonment imposed by a court of this state * * *."

{¶209} Pursuant to R.C. 2929.14(C)(4), a trial court may order multiple prison terms for convictions of multiple offenses to be served consecutively if the court finds that "consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public * * *." The trial court must also find that one of the following statutory factors applies:

{¶210} "(a) The offender committed one or more of the multiples offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

{¶211} "(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses

48

so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

{¶212} "(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender."

### Sentence Contrary to Law

{¶213} "In order to impose consecutive terms of imprisonment, a trial court is required to make the findings mandated by R.C. 2929.14(C)(4) at the sentencing hearing and incorporate its findings into its sentencing entry * * *." *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, ¶ 37. Otherwise, the imposition of consecutive sentences is contrary to law. *See id.* The trial court is not required "to give a talismanic incantation of the words of the statute, provided that the necessary findings can be found in the record and are incorporated into the sentencing entry." *Id.*

{¶214} Mr. Davis contends the trial court relied on R.C. 2929.14(C)(4)(b) to justify consecutive sentences, but that this crime was a single act rather than a "continuous act."

{¶215} As to consecutive sentences imposed at the sentencing hearing, the court stated:

{¶216} "The court determines that consecutive sentences are necessary to protect the public and punish this offender. It would not be disproportionate to his conduct and the danger he poses, and that the harm is so great or unusual that a single term would not adequately reflect the seriousness of this conduct."

{¶217} The court also stated in its findings that it determined Mr. Davis had "committed the worst form of attempted murder and poses the greatest likelihood of recidivism because of his mental condition."

{¶218} Thus, it is clear the necessary findings are in the record and are incorporated into the sentencing entry, and the trial court's imposition of consecutive sentences is not contrary to law. Moreover, a plain reading of the statute belies Mr. Davis's arguments – he committed two or more multiple offenses "as part of *one* or more courses of conduct." In other words, Mr. Davis was convicted of murder and attempted murder as part of one course of conduct, i.e., driving a vehicle into an oncoming vehicle at an excessive rate of speed with the intent to collide.

{¶219} Mr. Davis's eighth assignment of error is without merit.

{¶220} For the foregoing reasons, the judgment of the Lake County Court of Common Pleas is affirmed.


CYNTHIA WESTCOTT RICE, J.,

TIMOTHY P. CANNON, J.,

concur.

50