[Cite as *State v. Young*, 2022-Ohio-4726.]

COURT OF APPEALS
COSHOCTON COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | JUDGES: |
| | : | |
| | : | Hon. W. Scott Gwin, P.J. |
| Plaintiff-Appellee | : | Hon. John W. Wise, J. |
| | : | Hon. Patricia A. Delaney, J. |
| -vs- | : | |
| | : | Case No. 21CA0028 |
| | : | |
| EDWARD YOUNG | : | |
| | : | |
| | : | |
| Defendant-Appellant | : | O P I N I O N |

CHARACTER OF PROCEEDING:    Appeal from the Coshocton County
Court of Common Pleas, Case No.
21CR13

JUDGMENT:    AFFIRMED

DATE OF JUDGMENT ENTRY:    December 28, 2022

APPEARANCES:

For Plaintiff-Appellee:                    For Defendant-Appellant:

JASON W. GIVEN                        SAMUEL H. SHAMANSKY
COSHOCTON CO. PROSECUTOR       523 South Third Street
318 Chestnut Street                  Columbus, OH 43215
Coshocton, OH 43812

*Delaney, J.*

{¶1} Appellant Edward Young appeals from the November 18, 2021, Judgment Entry—Jury Verdict and Sentencing of the Coshocton County Court of Common Pleas. Appellee is the state of Ohio.

**FACTS AND PROCEDURAL HISTORY**

{¶2} Appellant's wife, one of the victims in this matter, is Jane Doe. Appellant and Jane lived at a property which abutted the property of one of Jane's brothers, John Roe. John is also one of the victims in this matter. John lived at his residence with his girlfriend, Mary, and Mary's children.

{¶3} On January 4, 2021, Mary was working from home as a customer service associate for a call center. She was seated in an upstairs bedroom, in which John was also napping. Five of Mary's six children were also present in the residence. Around 5:00 p.m., Mary was on the phone with a customer when she heard a loud noise downstairs, as though someone was breaking in. She awakened John and sent him downstairs, armed.[1]  Mary remained on the phone.

{¶4} Mary recognized appellant's voice downstairs. She also heard John's voice, and Jane Doe's.  The group was arguing.  Mary heard the argument move outside the residence, then back in, and she heard several gunshots. She put the customer on hold and ran to investigate, first checking on her children in another upstairs bedroom.

---

[1] Mary testified that when John woke up in the bedroom, he was wearing a gun belt because she was worried about an ex-boyfriend coming to the house. When she heard the break-in, she first thought it must be the ex-boyfriend. Although John was armed as he went downstairs, the evidence showed John did not draw his weapon during the confrontation with appellant.  John's weapon was still holstered when his body was found.

{¶5} As she proceeded downstairs, Mary saw appellant at the bottom of the stairs, next to John's body.  Appellant was holding a pistol.  Appellant said he "knew what John and Jane had done," and that he was not going to hurt Mary because he liked her. Mary yelled for her oldest Son to call 911.

{¶6} In the meantime, Neighbor was outside walking her dog.  Neighbor testified that she saw appellant and his wife Jane in the front yard of John's residence and saw John in the doorway of his residence.  All three entered the residence, arguing.  She then heard several pops or bangs and saw Jane exit through the front door and collapse near a tree. Appellant exited the residence with a gun in his hand and approached Jane and yelled something at her as she lay on the ground.

{¶7} Neighbor then saw appellant run back to his own residence, leave momentarily in his car, and then return. He left again in his car, driving through the neighborhood and ending up in front of John and Mary's residence.

{¶8} In the meantime, Mary's oldest Son was on the phone with the sheriff's department. Son observed appellant pull up in his car; appellant approached Son and told him to hang up the phone. Appellant took the phone from Son and tossed it. Appellant then approached Jane again, who was still on the ground, and attempted to remove something from her pocket. He then left again in his car. Son described the car to law enforcement. Son also observed appellant's four young children in the backseat of the car.

{¶9} Sheriff's deputies intercepted appellant's car and tried to stop him, but appellant refused to comply and fled.  He eventually crashed into another vehicle,

disabling his own car. Appellant was apprehended without further incident and his children were safely recovered by law enforcement.

{¶10} The next day, detectives questioned appellant and he eventually requested an attorney. Later the same day, however, he contacted detectives and voluntarily spoke to Detective Andrews. After being Mirandized, appellant told Andrews he had no recollection of the murders or the ensuing events. Appellant's statements were videotaped and introduced at trial.

{¶11} Law enforcement processed the crime scene and collected evidence. The 9-millimeter firearm was recovered in a field on the route of appellant's flight from deputies. Ballistics testing established the firearm was used to shoot and kill both Jane and John, who died as direct results of their gunshot wounds. Appellant's DNA was found on the ammunition clip recovered with the firearm, and gunpowder residue was found on appellant's hands.

{¶12} Appellant was charged by indictment with two counts of aggravated murder pursuant to R.C. 2903.01(A), both unclassified felonies [Counts I and II], and one count of having a weapon while under disability pursuant to R.C. 2923.13(B), a felony of the third degree [Count III]. Appellant entered pleas of not guilty and the matter proceeded to trial by jury. Appellant was found guilty as charged.

{¶13} The trial court sentenced appellant to life in prison without the possibility of parole upon Counts I and II, along with additional terms of 3 years for accompanying firearm specifications. Appellant was sentenced to a prison term of 36 months upon Count III. The trial court ordered the sentences for all three counts and the firearm specifications to be served consecutively.

{¶14} Appellant now appeals from the judgment entry of his convictions and sentence.

{¶15} Appellant raises four assignments of error:

**ASSIGNMENTS OF ERROR**

{¶16} "I. THE TRIAL COURT ERRED AND DEPRIVED APPELLANT OF DUE PROCESS OF LAW AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE ONE SECTION TEN OF THE OHIO CONSTITUTION BY FINDING HIM GUILTY OF AGGRAVATED MURDER AND HAVING WEAPONS WHILE UNDER DISABILITY AS THOSE VERDICTS WERE NOT SUPPORTED BY SUFFICIENT EVIDENCE AND WERE ALSO AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

{¶17} "II. THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT BY CLOSING AND LOCKING THE COURTROOM DURING HIS JURY TRIAL, IN VIOLATION OF HIS RIGHT TO A PUBLIC TRIAL AND DUE PROCESS OF LAW PURSUANT TO THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE ONE SECTION TEN OF THE OHIO CONSTITUTION."

{¶18} "III. THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT BY PERMITTING TESTIMONY AT HIS JURY TRIAL IN VIOLATION OF *DOYLE V. OHIO*, THEREBY DEPRIVING HIM OF DUE PROCESS OF LAW PURSUANT TO THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE ONE SECTION TEN OF THE OHIO CONSTITUTION."

{¶19} "IV. APPELLANT'S TRIAL COUNSEL WAS INEFFECTIVE THEREBY DEPRIVING HIM OF THE RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL PURSUANT TO THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION."

**ANALYSIS**

I.

{¶20} In his first assignment of error, appellant argues his convictions are not supported by sufficient evidence and are against the manifest weight of the evidence. We disagree.

{¶21} The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different. *State v. Thompkins*, 78 Ohio St.3d 380, 1997-Ohio-52, 678 N.E.2d 541, paragraph two of the syllabus. The standard of review for a challenge to the sufficiency of the evidence is set forth in *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991) at paragraph two of the syllabus, in which the Ohio Supreme Court held, "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Thus, an appellate court's role is limited. It does not ask whether the evidence should be believed or assess the evidence's "credibility or effect in inducing belief." *State v. Jones*, 166 Ohio St.3d 85, 2021-Ohio-3311, 182 N.E.3d 1161, *reconsideration denied,* 165 Ohio

St.3d 1458, 2021-Ohio-4033, 176 N.E.3d 767, and *cert. denied,* 213 L.Ed.2d 1005, 142 S.Ct. 2766, citing *State v. Richardson*, 150 Ohio St.3d 554, 2016-Ohio-8448, 84 N.E.3d 993, ¶ 13, citing *Thompkins*, 78 Ohio St.3d at 386, 678 N.E.2d 541. Instead, it asks whether the evidence against a defendant, *if believed*, supports the conviction. *Id.,* citing *Thompkins* at 390, 678 N.E.2d 541 (Cook, J., concurring).

{¶22} In determining whether a conviction is against the manifest weight of the evidence, the court of appeals functions as the "thirteenth juror," and after "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be overturned, and a new trial ordered." *State v. Thompkins*, supra, 78 Ohio St.3d at 387. Reversing a conviction as being against the manifest weight of the evidence and ordering a new trial should be reserved for only the "exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶23} Appellant was found guilty of two counts of aggravated murder pursuant to R.C. 2903.01(A), which states in pertinent part, "No person shall purposely, and with prior calculation and design, cause the death of another." "'Prior calculation and design' are not defined in the Revised Code but is more than just an instantaneous decision to kill; it encompasses planning 'a scheme designed to carry out the calculated decision to cause the death.'" *State v. Calvert*, 5th Dist. Guernsey No. 03CA19, 2004-Ohio-6366, ¶ 49, citing *State v. Jones,* 91 Ohio St.3d 335, 348, 2001-Ohio-57, 744 N.E.2d 1163, internal citations omitted. Prior calculation and design are considered "a more stringent element than

premeditation." *Id., citing State v. Green,* 90 Ohio St.3d 352, 357, 738 N.E.2d 1208, internal citation omitted.

{¶24} Appellant argues there is no evidence of prior calculation and design in the instant case; he did not recall the murders and his motive was unclear, and he asserts that "* * *the shootings appear to be the instantaneous result of an argument between the three parties." Brief, 4.

{¶25} In *State v. Taylor*, 78 Ohio St.3d 15, 18–20, 676 N.E.2d 82, 88–89 (1997), the Ohio Supreme Court considered the meaning of "prior calculation and design," noting the following at page 19:

> * * * *
>
> According to [the 1973 Technical Committee Comment to Am.Sub.H.B. No. 511, a Legislative Service Commission summary], "the phrase 'prior calculation and design' [was employed] to indicate studied care in planning or analyzing the means of the crime as well as a scheme encompassing the death of the victim. Neither the degree of care nor the length of time * * * are critical factors in themselves, but they must amount to more than momentary deliberation."
>
> In *State v. Cotton* (1978), 56 Ohio St.2d 8, 10 O.O.3d 4, 381 N.E.2d 190, at paragraph one of the syllabi, we agreed that "'prior calculation and design' is a more stringent element than the 'deliberate and premeditated malice' which was required under prior law." The General Assembly's apparent intention "was to require more

than the few  moments of deliberation permitted in common law interpretations of the former murder statute, and to require a scheme designed to implement the calculated decision to kill." *Id.,* 56 Ohio St.2d at 11, 10 O.O.3d at 6, 381 N.E.2d at 193. Also, in *Cotton,* at paragraph two of the syllabus, we held that "[i]nstantaneous deliberation is not sufficient to constitute 'prior calculation and design.'"

* * * *.

In *State v. Jenkins,* 48 Ohio App.2d at 102, 2 O.O.3d at 75, 355 N.E.2d at 828, the court of appeals found three factors important in determining whether prior calculation and design exists: (1) Did the accused and victim know each other, and if so, was that relationship strained? (2) Did the accused give thought or preparation to choosing the murder weapon or murder site? and (3) Was the act drawn out or "an almost instantaneous eruption of events"?

Our review of the preceding cited cases convinces us that it is not possible to formulate a bright-line test that emphatically distinguishes between the presence or absence of "prior calculation and design." Instead, each case turns on the particular facts and evidence presented at trial.

*State v. Taylor*, 78 Ohio St.3d 15, 19, 676 N.E.2d 82 (1997).

{¶26} In the instant case, appellant knew both victims well, and his relationship with Jane had become strained over appellant's belief that Jane had an incestuous

relationship with John, an allegation he made to Andrews and to which he obliquely referred when Mary found him at the bottom of the steps, standing over John's body.

{¶27} The evidence admitted at trial also showed deliberation and planning. Appellant told Andrews he recalled Jane leaving the house in the direction of John's house; appellant re-entered the residence before following her. Police found an empty firearm case in appellant's house with the make, model, and serial number matching the weapon that killed Jane and John.

{¶28} The final issue is whether appellant acted with "more than momentary deliberation," or whether the act was "an almost instantaneous eruption of events." *Taylor,* supra. * * * *. Appellant retrieved the weapon, followed Jane to John's residence, and argued with both before he shot them. "Prior calculation and design can be found even when the killer quickly conceived and executed the plan to kill within a few minutes," *State v. Coley,* 93 Ohio St.3d 253, 264, 754 N.E.2d 1129 (2001), as long as the killer's actions "went beyond a momentary impulse and show that he was determined to complete a specific course of action," *State v. Conway,* 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 46. Appellant fired ten shots inside John's residence, and one was to John's head. A shot to the head at close range "bespeaks a calculated, execution-style murder." *State v. Campbell*, 90 Ohio St.3d 320, 330, 738 N.E.2d 1178, 1193 (2000), citing *State v. Palmer,* 80 Ohio St.3d 543, 570, 687 N.E.2d 685 (1997).

{¶29} Although "the events here took place in short order," a juror could reasonably infer appellant "had adopted and carried out a plan to kill." *Jones*, supra,

2021-Ohio-3311, at ¶ 26.  Appellee presented sufficient evidence of prior calculation and design, and the jury did not lose its way in finding appellant guilty of aggravated murder.

{¶30} Appellant's convictions upon two counts of aggravated murder are supported by sufficient evidence and are not against the manifest weight of the evidence. Appellant's first assignment of error is overruled.

II.

{¶31} In his second assignment of error, appellant argues the trial court committed structural error in closing the courtroom to the public during the testimony of the coroner. We disagree.

{¶32} The Sixth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." Section 10, Article I of the Ohio Constitution also guarantees an accused the right to a public trial. The right to a public trial is not absolute, and in some instances must yield to other interests, such as those essential to the administration of justice. A trial judge has authority to exercise control over the proceedings and the discretion to impose control over the proceedings. Nonetheless, the abridgement of a defendant's right to a public trial may occur only when necessary, and any closure must be narrowly drawn and applied sparingly. *See, State ex rel. The Repository, Div. of Thompson Newspapers, Inc. v. Unger,* 28 Ohio St.3d 418, 421, 504 N.E.2d 37 (1986); *State v. Lane,* 60 Ohio St.2d 112, 121, 397 N.E.2d 1338 (1979).

{¶33} In *Waller v. Georgia*, the Supreme Court established the test for determining whether a courtroom closure violates a criminal defendant's Sixth

Amendment right to a public trial: "The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered." 467 U.S. 39, 48, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984), internal citation omitted. In the same opinion, the Supreme Court articulated the test as a four-factor analysis: [(1)] the party seeking to close a public hearing must advance an overriding interest that is likely to be prejudiced, [(2)] the closure must be no broader than necessary to protect that interest, [(3)] the trial court must consider reasonable alternatives to closing the proceeding, and [(4)] it must make findings adequate to support the closure. *Id.* at 48. Courts frequently call this the "*Waller* test."

{¶34} The Supreme Court of Ohio in *Drummond* subsequently modified the *Waller* test in cases where the trial closure is partial rather than total. In *Drummond*, the court concluded "[w]hen a trial judge orders a partial, as opposed to a total, closure of a court proceeding, a 'substantial reason' rather than *Waller's* 'overriding interest' will justify the closure." 111 Ohio St.3d 14, 53, 2006-Ohio-5084, 854 N.E.2d 1038.

{¶35} In the instant case, prior to the testimony of Dr. Lee, the deputy coroner who autopsied both victims, the following statement was made by the trial court:

The time is now 10:04 a.m., and we have reconvened in Case 21-CR-0013. The defendant is present accompanied by counsel as is the prosecuting attorney and assistant prosecutor. All 12 members of the jury are present as well as the two alternates. It's at this time that the state has advised the court they will call Dr. Lee who is a forensic pathologist. Once

Dr. Lee comes in and takes the witness stand, I just want to note for the record the doors will be locked so that there can be no further entrance during his testimony.

T. 252.

{¶36} The closure of the courtroom was a partial closure because it was closed only during the testimony of one witness, and it appears from the record that the trial court prevented persons from entering and leaving during the testimony but did not clear the courtroom altogether. After Lee's testimony concluded, the trial court stated the courtroom could now be unlocked, and appellee asked for a moment to "alert the victim's family that Dr. Lee's testimony is concluded and that we're moving onto the next phase of the trial." T. 280-281.

{¶37} The trial court offered no explanation for closure of the courtroom, and neither party objected. The trial court did not make any findings or otherwise address the *Waller* and *Drummond* factors, supra. Appellant argues the sua sponte closure of the courtroom violated his right to a public trial and requires reversal.

{¶38} We note the Ohio Supreme Court recently decided a case which originally arose in this District, directly addressing the nature of structural error when a defendant is denied the right to a public trial due to a courtroom closure. In *State v. Bond*, 2022-Ohio-4150, the Ohio Supreme Court found that a public-trial violation may occur, and the violation may be structural error, but in the absence of objection by the defendant, such error may not require correction.

{¶39} *Bond* is instructive to our analysis of the instant case. We do find a public-trial violation because the record does not establish the trial court made any *Waller*

analysis, or offered any explanation, for the sua sponte closure of the courtroom. *State v. Bond*, 2022-Ohio-4150, ¶ 15. Neither party objected to the closure. While a public-trial error is structural error, it is not necessarily correctible error when the defendant failed to object. *Id., ¶* 16.

{¶40} The Court found that a plain-error analysis must be applied to determine whether the public-trial violation affected the defendant's substantial rights, and that the appropriate test is not whether the violation affected the outcome of the trial because "a structural error may affect substantial rights even if the defendant cannot show that the outcome of the trial would have been different had the error not occurred." *Id.,* at ¶ 32. Nor, however, does structural error require automatic reversal. *Id.,* at ¶ 33.

{¶41} The issue is more subjective and requires an evaluation of the courtroom closure in the context of the entire trial. "[T]he final consideration in the plain-error analysis is whether correcting the error is required to prevent a manifest miscarriage of justice or whether the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.*, citing *Olano*, 507 U.S. at 736, 113 S.Ct. 1770, 123 L.Ed.2d 508; *Long*, 53 Ohio St.2d 91, 372 N.E.2d 804, paragraph three of the syllabus.

{¶42} The issue posed by the instant case is whether the public-trial violation in warrants correction. In *Bond*, the Ohio Supreme Court concluded the violation did not require correction:

> Here, the courtroom closure occurred during the state's presentation of evidence, after an eyewitness finished testifying. The courtroom closure was a partial one; the trial court permitted Bond's immediate family members and the victim's immediate family

members to attend the remainder of the trial. According to the state, the courtroom was closed only to the two individuals involved in the hallway disruption during the court's recess. Bond has not asserted that any specific person attempted to enter the courtroom and was denied access. Although the court's order limiting access to the courtroom was effective through the end of the trial, Bond has not asserted that any harm resulted from the closure. For example, he has not suggested that any of the trial participants failed to fulfill their duties appropriately during the remainder of trial or that the judge or prosecutor engaged in misconduct that went unnoticed because of the courtroom closure. The record indicates that the jurors were unaware of the judge's decision to limit courtroom access. While these factors might weigh differently in the context of a *Waller* analysis or if considered after an objection to the closure made in the trial court, we review the facts here in the context of a plain-error analysis, which means that Bond has the burden to show, within the plain-error framework, that the public-trial violation so affected the fairness of the proceeding as to require correction. Because Bond has not made that showing, we conclude that the public-trial violation in his trial did not rise to the level of a plain error that must be corrected.

*State v. Bond*, 2022-Ohio-4150, ¶ 37.

{¶43} In the instant case, closure of the courtroom was partial and access to the courtroom was limited for the testimony of one witness. Appellant has not asserted that anyone attempted to enter the courtroom and was denied access, and he has not described any harm resulting from closure of the courtroom during this testimony. *Id.* Appellant has the burden to show that the public-trial violation so affected the fairness of the proceeding as to require correction, but he makes no showing beyond the fact of the violation itself. *Id.* We thus conclude the public-trial violation did not rise to the level of a plain error that must be corrected. *Id.*

{¶44} Appellant's second assignment of error is overruled.

III.

{¶45} In his third assignment of error, appellant argues that appellee's use of his videotaped statement to Andrews constitutes a *Doyle* violation, effectively using his right to remain silent against him. We disagree.

{¶46} The right to remain silent is conferred by the United States and the Ohio Constitutions. The privilege against self-incrimination "is fulfilled only when the person is guaranteed the right 'to remain silent unless he chooses to speak in the unfettered exercise of his own will.'" *State v. Graber*, 95 N.E.3d 631, 641 (5th Dist. 2003) quoting *Miranda v. Arizona,* 384 U.S. 436, 460, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), internal citation omitted. The United States Supreme Court in *Miranda v. Arizona, supra,* detailed the well-known procedural safeguards, including the right to an attorney, to protect the privilege against self-incrimination. "A suspect's right to an attorney during questioning * * * is derivative of his right to remain silent." *State v. Leach*, 102 Ohio St.3d

135, 2004-Ohio-2147, 807 N.E.2d 335, ¶ 13 quoting *Wainwright v. Greenfield*, 474 U.S. 284, 298-299, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986) (Rehnquist, J., concurring).

{¶47} In *Doyle v. Ohio*, 426 U.S. 610, 618, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), the United States Supreme Court held that use of a defendant's post-arrest, post-*Miranda* silence for impeachment purposes violates the Due Process Clause of the Fourteenth Amendment. *State v. Leach*, 102 Ohio St.3d 135, 2004-Ohio-2147, 807 N.E.2d 335, ¶ 16. In *Wainwright v. Greenfield*, 474 U.S. 284, 298-299, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986), the United States Supreme Court held the use of a defendant's post-arrest, post-*Miranda* silence as substantive evidence of guilt violated due process. The State may not use a defendant's silence to lead the jury to the conclusion that innocent people speak to the police to clear up misunderstandings, while guilty people consult with their attorneys. *State v. Abraham*, 9th Dist. Summit No. 26258, 2012-Ohio-4248, 2012 WL 4100406, ¶ 42 citing *State v. Leach* at ¶ 32.

{¶48} In the instant case, appellant does not point to any overt reference by appellee to his post-arrest silence.  Instead, he argues appellee's implication was indirect; by showing the videos of his interrogations, appellee effectively commented on his silence because he asked for counsel at the conclusion of the first interrogation and claimed not to remember the events of the murders. We find no evidence that appellee used appellant's  rights  to silence and counsel  as evidence of guilt at any  stage of the proceedings,  and  we  find  no  authority  applying  *Doyle's*  rationale  under  these circumstances.  Nor does appellant point us to any such authority.

{¶49} The record reveals that appellant gave a recorded interview, then invoked his right to counsel; he then asked to speak to the detective again and gave a voluntary

statement. Both statements were Mirandized. Appellant's interviews were part of appellee's evidence at trial, but we are unable to find any commentary by appellee on appellant's invocation of his rights to silence and to counsel as evidence of guilt.

{¶50} Appellant did not assert a *Doyle* violation at trial, and we find none here. We find no evidence appellee affirmatively sought to use appellant's invocation of his right to counsel as proof of guilt; nor did appellee use the evidence for impeachment purposes. *State v. Edmonds*, 5th Dist. No. 17-CA-53, 2018-Ohio-2832, 117 N.E.3d 83, ¶ 22.

{¶51} Appellant's third assignment of error is overruled.

IV.

{¶52} In his fourth assignment of error, appellant incorporates the arguments raised in his second and third assignments of error, summarily arguing he received ineffective assistance of defense trial counsel. We disagree.

{¶53} A claim of ineffective assistance of counsel requires a two-prong analysis. The first inquiry is whether counsel's performance fell below an objective standard of reasonable representation involving a substantial violation of any of defense counsel's essential duties to appellant. The second prong is whether the appellant was prejudiced by counsel's ineffectiveness. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989). To warrant a finding that trial counsel was ineffective, the petitioner must meet both the deficient performance and prejudice prongs of *Strickland* and *Bradley. Knowles v. Mirzayance*, 556 U.S. 111, 129 S.Ct. 1411, 1419, 173 L.Ed.2d 251 (2009).

{¶54} The United States Supreme Court discussed the prejudice prong of the *Strickland* test:

With respect to prejudice, a challenger must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*, at 694, 104 S.Ct. 2052. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.*, at 693, 104 S.Ct. 2052. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.*, at 687, 104 S.Ct. 2052.

{¶55} The United States Supreme Court and the Ohio Supreme Court have held a reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Bradley,* 42 Ohio St.3d at 143, 538 N.E.2d 373, *quoting Strickland,* 466 U.S. at 697, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

{¶56} Debatable strategic and tactical decisions may not form the basis of a claim for ineffective assistance of counsel. *State v. Phillips*, 74 Ohio St.3d 72, 85, 656 N.E.2d 643 (1995). Even if the wisdom of an approach is questionable, "debatable trial tactics" do not constitute ineffective assistance of counsel. *Id.*

{¶57} Appellant summarily argues defense trial counsel was ineffective in failing to object to the sua sponte closing of the courtroom and to appellee's use of his videotaped interviews for the reasons cited in his second and third assignments of error. We overruled those assignments of error, and find counsel was not ineffective in failing

to raise the stated objections.  Even if the alleged errors were objectionable and counsel was deficient, the perceived deficiencies had no effect on the outcome of the trial.

{¶58} Upon review we find there is no reasonable probability that the outcome of the trial would have been different had counsel made the argued objections. "Trial counsel is not ineffective for choosing, for tactical reasons, not to pursue every possible trial objection." *State v. West*, 5th Dist. No. 16 CA 11, 2017-Ohio-4055, 91 N.E.3d 365, ¶ 102, citing *State v. Raypole*, 12th Dist. Fayette No. CA2014-05-009, 2015-Ohio-827, ¶ 24.

{¶59} Appellant's fourth assignment of error is overruled.

**CONCLUSION**

{¶60} Appellant's four assignments of error are overruled, and the judgment of the Coshocton County Court of Common Pleas is affirmed.

By:  Delaney, J.,

Gwin, P.J. and

Wise, John, J., concur.